·THE STATE v. DUSENBERRY, *Appellant.*

Division Two, November 15, 1892.

1. **Criminal Practice:** CHANGE OF VENUE: TRANSCRIPT. An objection that the clerk of the circuit court of the county where defendant.

| 112 | 277 |
| 118 | 123 |
| 118 | 145 |

| 112 | 277 |
| 125 | 19 |

| 112 | 277 |
| 128 | 472 |

| 112 | 277 |
| 131 | 457 |

| 112 | 277 |
| 134 | 158 |
| 65a | 452 |

The State v. Dusenberry.

was indicted did not on change of venue affix his official seal to his certificate to the transcript of the record comes too late when made for the first time after verdict.

2. ———: SPECIAL GRAND JURY: PRESUMPTION. It will not be presumed that the circuit court impaneled a special grand jury before the discharge of the regular one.

3. ———: CONTINUANCE: SICKNESS OF ATTORNEYS. The application for a continuance on the ground of the sickness of defendant's attorneys *held* properly overruled.

4. ———: ———: DEFECTIVE AFFIDAVIT. The affidavit in support of an application for continuance is fatally defective if it fails to aver that defendant believed the facts he expected to prove by the absent witnesses were true.

5. ———: JURORS. Where opportunity was given the defendant to challenge for cause and all the jurors constituting the panel were qualified, tested by the ordinary criteria laid down by the supreme court, the jury were properly impaneled.

6. ———: ———. The fact that some of the jurors selected on the panel had heard the statements of counsel on defendant's last application for a continuance, which were of a character likely to prejudice their minds against him and his defense, did not disqualify them.

7. ———: RAPE: OPINION OF WITNESS. The opinion of a witness on a trial for rape as to the ability of the defendant to have held the prosecutrix as testified to by her is incompetent.

8. ———: ———: ———. That which is within the common knowledge of mankind is not the proper subject of expert testimony.

9. Criminal Practice: RAPE: UNCORROBORATED TESTIMONY OF PROSECUTRIX. A conviction of rape may be had on the uncorroborated testimony of the prosecutrix.

10. ———: MISCONDUCT OF BYSTANDERS. Where everything possible has been done by the court and counsel to neutralize the misconduct of bystanders prejudicial to the accused on trial, the judgment will not be reversed because of such misconduct.

11. ———: IMPROPER REMARKS OF COUNSEL: EXCEPTIONS. Improper remarks of counsel will not be reviewed in the supreme court unless exceptions are duly saved.

12. ———: OBJECTION: EXCEPTION. An objection without an exception is insufficient.

13. ———: PREJUDICE OF JURORS: NEW TRIAL. The supreme court will not disturb the refusal of the trial court to grant a new trial because of the prejudice of the jurors, where it does not appear that the court abused its discretion.

14. ——: IMPEACHING VERDICT: AFFIDAVIT OF JUROR. The affidavit of a juror as to the manner of reaching a verdict will not be considered for the purpose of impeaching the verdict.

15. ——: AMENDED MOTION FOR NEW TRIAL. The refusal of the court to permit after the lapse of four days the filing of an amended motion for a new trial assigning as additional ground therefor the improper interference of one of the state's attorneys in summoning talesmen to serve on the jury, *held* properly refused.

16. Criminal Law: RAPE: "UTMOST RESISTANCE." The "utmost resistance" doctrine in rape cases does not apply where the female is put in fear of personal violence and her will overcome, or where intercourse is had with her by fraud as by personating her husband, or where she is insensible from intoxicants or drugs.

17. ——: ——. The conviction of defendant of rape and his sentence to thirty-five years' imprisonment in the penitentiary sustained.

*Appeal from Audrain Circuit Court.*—HON. E. M. HUGHES, Judge.

AFFIRMED.

*J. D. Barnett* for appellant.

(1) The court erred in overruling defendant's motion for a continuance made October 14, 1889. The physical condition of counsel made a trial impossible. (2) The court erred in appointing counsel for defendant, at the suggestion of the state. (3) The court erred in overruling defendant's motion for a continuance made November 11, 1889. The evidence of witness McGuffin and witness Brooksher was of vast importance to defendant. (4) The court erred in refusing to pass upon the qualification of each juror presented for examination on the *voir dire* at the time of his examination. (5) The court erred in withholding from defendant the names of the qualified and accepted jurors until the panel of forty was completed. (6) The court erred in overruling defendant's motion to quash the jury panel. It is evident that a large

number of the panel were incompetent. (7) There was no transcript from Montgomery county on file; the purported copy was not under the seal of the clerk of said court. (8) The court erred in permitting the witness Rombean to testify, against the objection of defendant, as to the condition in which he found the prosecuting witness the morning following the alleged offense. (9) The court erred in permitting the witness, Mrs. Rombean, to testify, against the objection of defendant, as to the condition in which she found the prosecutrix the morning after the alleged offense. (10) The court erred in the matter of giving instructions and in overruling the motion for new trial. (11) The court erred in refusing to permit defendant to amend his motion for a new trial. (12) The court erred in not sustaining the motion in arrest of judgment.

*John M. Wood*, Attorney General, and *John M. Barker* for the State.

(1) No error was committed in overruling defendant's application for a continuance made November 11, 1889. (2) Sickness of counsel is no cause for continuance. *State v. Bailey*, 94 Mo. 311. (3) The objection to the Montgomery county transcript, because not under the seal of the clerk, came too late after verdict. *Henderson v. Henderson*, 55 Mo. 534; *Gilstrap v. Felts*, 50 Mo. 528; *State v. Laporte*, 6 Mo. 208; *Hughes v. People*, 6 N. E. Rep. (Ill.) 55. (4) The law has been settled by this court that counsel hired to assist in the prosecution can conduct the same and open and close the argument. (5) Upon the evidence presented in support of and in opposition to the allegations in the motion for a new trial relative to the conduct of the prosecuting officers and the jurors, the trial court found that the charges of misconduct were not sustained, and

this finding, being supported by the evidence, which it was the duty of the trial judge to consider and weigh, will not be disturbed in the appellate court. *State v. Gonce*, 87 Mo. 627; *State v. Cook*, 84 Mo. 40; *Morgan v. Ross*, 74 Mo. 318. (6) A juror cannot impeach his verdict, and the court did not err in refusing to consider the affidavit of juror Fowles. *State v. McNamara*, 100 Mo. 100; *State v. Rush*, 95 Mo. 199. (7) Defendant could not amend his motion for a new trial after the expiration of the time fixed by law. *State v. Brooks*, 92 Mo. 542.

STATEMENT.

THOMAS, J.—The defendant appeals from a sentence by the circuit court of Audrain county, to imprisonment in the penitentiary for a term of thirty-five years for rape.

As is usual in cases of this character, the principal witnesses were the prosecutrix and the defendant. The story told by the prosecutrix, Bettie Sira, is in substance as follows: Her home was in Tazewell county, Virginia. On the second of November, 1888, she, being then a little over sixteen years old, and still wearing short dresses, left home to visit some relatives living in Benton City, Audrain county, Missouri. She arrived in St. Louis on the fourth, and took a train on the Wabash railway on the evening of that day, going west. On presentation of her ticket, the conductor informed her that the train she was on did not stop at Benton City, and that she would have to get off at the next station, and take a train going east; that she could get off at Mexico or Montgomery City. The defendant approached her while on the train, inquired her name, where she was from and where she was going. She told him, and then he told her he lived at Montgomery

City, and would see her to the hotel where he boarded. Getting off the train at Montgomery City, the defendant took her into a room and locked the door; she supposed it was a hotel, but upon inquiry she found she was in a saloon kept by defendant as bar tender. He lit the lamp, but turned it down low. She begged him to take her to a hotel; she cried and hallooed, and he took hold of her and told her if she wanted to get out alive she had better not make any noise, and put his hand over her mouth. By the exhibition of a knife and pistol, and by threats putting her in fear, he forced her to submit to sexual intercourse with him twice. He stripped her and himself of all their clothes except undergarments, and then forced her onto a quilt or blanket on the floor, where he had the intercourse with her. She struggled all she could, or all she dared to. He kept her in the saloon till about five o'clock in the morning, when he took her a part of the way, pointed out the hotel and left her. Mr. Rombean, the keeper of the hotel, showed her a room. She did not sleep, however, and went to breakfast about seven o'clock. When she finished breakfast she asked Mrs. Rombean to go to her room; that she wanted to talk to her. The girl went first, and in a short time Mrs. Rombean went to her room, followed by Mr. Rombean, and she then and there told what had occurred at the saloon. Just before she left the saloon, defendant made her promise not to tell anyone about the affair. She told him she could not remember his name, and he then wrote his name down and gave it to her, and this was produced at the trial.

Mr. Rombean testified that when she came to the hotel her eyes were very red, and her face looked like she had been crying, and she seemed nervous and excited. When he went to her room after breakfast,

she was crying and wringing her hands and walking the floor. She told him what was the matter.

Mrs. Rombean testified that she first saw the girl at the breakfast table, and she looked like she had been crying, and her face was swollen and puffed up and she seemed nervous and broken down. When she reached her room, she heard her walking the floor, and she came out in the hall and was crying, and being asked she told what was the matter. The witness examined the girl, and found her underclothing "all full of blood," there being a splotch on her chemise larger than her hand, caused by pure blood, not menstruation.

The girl's father testified that she was born October 9, 1872, and consequently was a little over sixteen years old on November 4, 1888. She was corroborated as to her age by other witnesses. The prosecuting attorney was sent for, and he prepared the papers for a warrant for the defendant that same day, Monday, November 5.

The girl went to Benton City, and about ten days afterwards she was taken back to Montgomery City, where several doctors examined her and found a laceration in the vagina which was then in the process of healing. The morning the girl first went to the hotel in Montgomery City was Monday, and on the next Saturday defendant was arrested in Kansas City upon a charge of ravishing her, and when arrested the sheriff testified that he asked him to let him go and nobody would know it, and that he would do all he could for him. He also told the sheriff, so the sheriff testified, that he boarded the train at Montgomery City on the opposite side from the depot, and that he knew the marshal was after him. He also said that if the sheriff had been a day later he would have been in Washington Territory, or somewhere out west.

The defendant in his testimony corroborated the prosecutrix in regard to her desire to go to Benton City, and her inability to do so on account of being on the wrong train. He got into conversation with her on the train, and she asked him where he lived, and what business he was engaged in. He told her he lived in Montgomery City, and kept a saloon there. She asked him if there was a hotel there, and he replied there was one near the depot where he boarded, and it was a good place to stop at. She told him she had the toothache, and wanted to know if he would get her some whiskey for it when they reached Montgomery City, and he said he would. They got off at Montgomery City, and he pointed out Rombean's hotel, and told her she could go there, and then she asked him if he was not going to get that whiskey for her; asked how far it was to the saloon. He told her it was two blocks, and she said she would go with him there if he said so. He told her, if she wanted to walk down there for it, he would give her the whiskey. They went into the saloon, and he lit a lamp. She walked right in behind the counter, and set out the bottles and glasses just like a man. She put whiskey in her mouth and spit it out. She stood at the counter thirty, forty or fifty minutes talking to him and showing him some books and pictures she had. Upon inquiry by her, he told her a train going east would be along in an hour or two, and she said she preferred while waiting for the train to stay there to going to the hotel, and asked him to lock the door and turn down the lamp, as somebody seeing the light might want to come in. He locked the door then and turned down the lamp low. He got her a chair and then sat down in another chair himself, so he could sleep a little. She set her basket she had with her in the chair provided for her, and went and sat down in his lap,

where she remained about twenty minutes, when he suggested sexual intercourse, to which she assented. She took off part of her clothing and he took off a part of his, and they laid down on a rug or quilt, and he had intercourse with her twice.   He then went to sleep. When the train came along she waked him, and they got up and dressed.   She then told him she was a cutter and fitter, and asked him about the probability of her getting work in Montgomery City.   He told her how large that city was, and gave her the name of a lady to whom she could apply in regard to business. She asked him if he could not get her a room with a lock to it, so he could sleep with her.   He told her he could not do that as he was a married man, and it might be found out.   She asked him not to recognize her at the hotel, for the landlord might "catch on and put her out."   She wanted him to write to her, if he found any place for her, and at her request he wrote his name on a piece of paper and gave it to her, or he gave her his name and she wrote it down, he could not tell exactly which.   They then went out of the saloon, it being near five o'clock, and, as they were proceeding to the hotel, she suggested that he might be recognized and that he had better go back.   He adopted the suggestion.   He boarded at the Rombean hotel, and took breakfast and dinner there that day, but did not see the girl.

About 1:30 o'clock that day Mr. Ferguson, who owned the saloon in question, informed defendant that the girl had made a charge of rape against him, which was a very serious one; that next day was election day and it might be hard to tell what the people would do if it got out, and that it would be better for him to leave.   Ferguson informed him this advice came from the prosecuting attorney, and the latter had promised to hold up the warrant till he could get

away. The defendant replied that he did not want to leave; that he was innocent, and people might think him guilty if he left; but being urged he concluded to keep out of the way for a while. He immediately left the saloon and hid in the second story of Ferguson's beer and icehouse, where he remained till the arrival of the night train going west, which he boarded from the side opposite the depot, and went to Kansas where he was arrested. He also testified that he intended to return in ten days, and did not tell the sheriff to let him go, but simply to let him return alone; that he disliked to return in the custody of an officer, and that he did not say to the sheriff that if the latter had been a day later he would have been in Washington Territory or somewhere out west, but he did say that, if he wanted to get away, he could have been in Washington Territory or Denver, or something like that, as he had a week the start. Defendant denied having a pistol or knife at the saloon or that he used any threats of violence toward the prosecutrix while in the saloon. He said there was probably a pistol in the saloon, but it was locked in a drawer, and he did not have the key.

Mr. Ferguson corroborated defendant's statement in regard to his advice to leave, and the prosecuting attorney admitted telling Mr. Ferguson that Monday that the girl made a very serious charge against defendant, and it might be well enough for him to get out of the way, as next day was election day, and it was hard to tell what the people would do if the matter got out; but he denied that he agreed to withhold the warrant till he could get away, but on the contrary prepared the papers that day and sent them to Rombean to be given to the justice.

Defendant introduced the depositions of witness showing that the reputation of the prosecutrix for chastity was not good in Tazewell county, Virginia, and

the state introduced witnesses who testified her reputation was good.     He also proved his reputation was good.    The defendant also introduced evidence tending to show that the prosecutrix was from eighteen to twenty years of age.

The record is very voluminous, and there is a great mass of other evidence, the details of which we do not deem it necessary to set out.    Suffice it to say that on some collateral issues the prosecutrix and defendant were both corroborated and contradicted.    Other proceedings and facts necessary to an understanding of the questions decided will appear in the opinion.

### OPINION.

Defendant assigns twenty-six errors for a reversal of the judgment, but we do not deem many of them important, and we will notice such only as were pressed in the oral argument, and such as we regard entitled to special mention and consideration.

I.    The defendant was indicted in Montgomery county, and on his application the venue was changed to Audrain county, where he was tried and convicted. The clerk of the circuit court of the former county, though having an official seal, failed to attach it in his certificate to the transcript of the record, which he transmitted to the circuit court of the latter county, but at the point in the certificate where the seal usually appears he made a scroll and wrote the word "seal." The defendant interposed no objection to the authentication of the transcript, until after the verdict, when in his motion in arrest of judgment he urged that, by reason of the lack of the official seal to the certificate, the circuit court of Audrain county acquired no jurisdiction of the case.

This position cannot be maintained. It is the order granting the change of venue that confers jurisdiction on the court to which the case is sent. In *Gilstrap v. Felts*, 50 Mo. *loc. cit.* 431, it is said that "the jurisdiction does not depend upon whether the trial is had upon the *original* papers or upon copies, but upon the order of change and the presence of the parties." And again in *Henderson v. Henderson*, 55 Mo. *loc. cit.* 544, this court remarked that "the jurisdiction was conferred by the order of the court changing the venue, and the filing of the papers in the court to which the venue had been changed was only one of the necessary steps to be taken in the progress of the cause." If defendant had desired to take advantage of any defect in the authentication of the record, it was his plain duty to have called the attention of the court to it, in the proper manner, before trial. "The fact the transcript was not duly certified," says this court in *State v. Haws*, 98 Mo. *loc. cit.* 194, "did not deprive the Ozark court of the power to make an order in the cause. * * * The court to which a cause is removed on change of venue, and in which a transcript is filed, may allow the transcript to be withdrawn for the purpose of having the same perfected as to the clerk's certificate, or the seal of the court added."

Such objection as is here urged is clearly a matter of mere exception, and comes too late after verdict. *State v. Noeninger*, 108 Mo. 166, and cases above cited. Besides that, section 4115, Revised Statutes, 1889, provides *inter alia* that no judgment on an indictment shall be arrested for any "defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits." It certainly cannot be maintained that the lack of an impression of a metal seal on the paper containing the certificate affected or could affect the substantial rights of the

defendant on the merits. The objection comes too late, and the motion in arrest was, therefore, properly overruled.

II. The defendant assigns for error the finding of the indictment by a special grand jury, in the absence of any order in the record showing the discharge of the regular jury. The record in this court shows that the circuit court of Montgomery county convened in regular session on the twenty-second day of October, 1888, when a grand jury was impaneled, and on the thirty-first day of that month court adjourned to the tenth day of December following, without showing the discharge of the grand jury. On December 10 a special grand jury was impaneled, by an order of the court entered in its minutes, which returned the indictment in this case. Section 4084, Revised Statutes, 1889, provides that, "If any offense be committed or discovered during the sitting of any court having jurisdiction thereof, after the grand jury attending such court shall be discharged, such court may, in its discretion, by an order to be entered on its minutes, direct the sheriff to summon another grand jury." The alleged offense in this case was committed, if committed at all, in November, 1888, between the adjournment of the court in October and its convening in December, and was, therefore, committed during the sitting of the court within the meaning of the above section, and, in the absence of anything in the record to the contrary, we must presume the conditions authorizing the impaneling of a special grand jury existed. It would be a most violent presumption to hold that the court organized a special grand jury when the regular panel had not been discharged.

III. It is contended that the court erred in overruling defendant's application for a continuance made

VOL. 112—19

October 14, 1889. This application was based on the sickness of his attorneys. The trial was not begun till November 11, 1889, and the record shows that four attorneys appeared for the defendant, and made a most admirable and exhaustive defense, and among them we find the name of one of the attorneys who was sick in October, and the name of an ex-judge of the circuit court. We do not think defendant suffered for lack of counsel, and this point is overruled.

IV. The defendant assigns for error the overruling of his motion for a continuance made November 11. The indictment was returned December 11, 1888, and the trial set for the third Monday of January, 1889. On January 17, 1889, in vacation, the change of venue was awarded. On February 6, 1889, the circuit court of Audrain county continued the cause to the June term. On June 11, the cause was continued on application of defendant, on account of the absence of witnesses to the second Monday of August. On August 12, the defendant applied for a continuance on account of the absence of witnesses, which was overruled, and the cause set down for trial on August 26, and on that day the cause was on application of defendant continued to the October term on account of the absence of witnesses, at which time he made his application for continuance on account of the sickness of his attorneys as heretofore stated, and then came the overruling of the application November 11, which is now assigned for error.

The affidavit in support of this application was fatally defective in failing to aver that defendant believed the facts he expected to prove by the absent witnesses were true, as required by section 4181, Revised Statutes, 1889. Two of the most important witnesses alleged to have been absent afterwards appeared and testified at the trial; the deposition of

another was read, and no sort of diligence was shown to obtain the attendance of the other witness whose testimony defendant now complains he was deprived of by the action of the court. After all the continuances granted, and the indulgences shown him by the court he alleged that he had caused a subpoena for this witness to be issued about ten days prior to his application for another continuance, without showing or attempting to show why he had taken no steps sooner, either to obtain his attendance or take his deposition. The granting of continuances is largely in the discretion of the trial court, and we think this application was very properly refused.

V. The court committed no error in the impaneling of the jury to try the case. Ample opportunity was given defendant for making his challenges for cause, and all the jurors composing the panel of forty were qualified to sit, tested by the *critera* laid down by this court in many cases.

VI. Defendant moved to quash the panel of forty qualified jurors on the ground that thirty of them had heard the statements of the counsel on his last application for a continuance, which were of a character calculated to prejudice their minds against him and his defense. The court committed no error in overruling this motion. The fact that some of the men selected and placed on the panel had heard statements in regard to defendant's efforts to delay the case did not disqualify them *per se*. They were all examined on their *voir dire* afterwards, and that was the time to determine their qualifications, which the court did.

VII. Defendant complains of the action of the court in refusing to allow some of his witnesses to give their opinion as to whether defendant could have taken hold of the prosecutrix and held her in the saloon in the manner testified by her. The witnesses were per-

mitted, however, to describe to the jury the exact *locus in quo*, and we think the court properly refused to let them express their opinion as to what defendant could or could not have done. That was a question for the jury. What is within the common knowledge of mankind is not the proper subject of expert testimony. Wharton on Criminal Evidence [8 Ed.] sec. 405.

VIII. The instructions given by the court on its own motion, and at the instance of the state and defendant, very fairly put the case with all its issues to the jury. What was correct in the instructions refused was embraced in those given. The instruction given which told the jury that the state had no right, in a criminal case, to take and read depositions might have been very well omitted, but it declared the law correctly, and we do not see how it could have prejudiced defendant. *State v. Talbott*, 73 Mo. 347; *State v. Emory*, 76 Mo. 350.

The court properly refused the instruction prayed for by defendant to the effect that the jury could not convict him on the testimony of the prosecutrix alone, but that in order to convict they must believe from the evidence that the testimony was "not only reasonable and true, but must further find that she had been corroborated by some reliable witness in this case, bearing upon the material facts of the case." This instruction is objectionable in form and principle. It is not true that a party cannot be convicted on the uncorroborated testimony of the prosecutrix. Her testimony is to be weighed like that of any other witness, "and the jury are to believe her or not, or otherwise allow such weight to her testimony, as their judgments in the particular instance and circumstances dictate." 2 Bishop on Criminal Practice, sec. 963; Kelly on Criminal Law & Practice, sec. 508. See also opinion in *State v.*

*Wilcox,* 111 Mo. 569, where the same question was ruled the same way.

IX.    During the progress of the trial, a bystander made a remark in the presence of the jury derogatory to defendant, and the court promptly fined him for contempt, and, during the closing argument of Mr. Dryden for the state, there was manifestation of applause, whereupon the court ordered the sheriff to arrest the offending parties, if he knew who they were, and Mr. Dryden also denounced the applause as infamous. The court, it seems to us, performed its duty fully. But, besides this, the jurors were instructed "that they ought to determine this case solely from the evidence adduced in the case; and, in arriving at a conclusion as to whether the defendant is guilty or innocent of the offense charged in the indictment, they should not suffer their minds to be influenced by the prejudice which men naturally entertain against the offense charged; but, before they can find the defendant guilty, their minds should be convinced beyond a reasonable doubt solely by the testimony in the case." We cannot perceive how the court and counsel could have done more to neutralize the effect, if any, of the remarks and applause of the bystanders.

X.    The defendant interposed an objection to some remarks made by two of the counsel for the state in their arguments to the jury.    The court told one of the attorneys to keep within the record, and rebuked the other, and the latter immediately apologized to the court and jury, and stated that he was wrong. The record nowhere shows that defendant saved exceptions at the time to these remarks, or the action of the court thereon. "The rule in criminal cases in regard to matters of mere exception is precisely the same as in civil." And there having been no exceptions saved,

there is nothing in this record calling for review. *State v. McDonald*, 85 Mo. 539; Revised Statutes, 1889, sec. 4221; *State v. Stevenson*, 93 Mo. 91.

According to the authorities, an objection without exception is not enough. It is nothing but fair to the court and the attorneys that both should be distinctly informed at the time what exceptions are intended to be relied on for new trial, so that the error, if any, can be at once corrected. There is no question giving this court more trouble than that we are now considering. In the heat of extemporaneous debate, attorneys may say, and often do say, things they soon regret, and that ought not to have been said, and no one who has not had experience at *nisi prius* knows the delicate position the trial judge occupies in determining *at once* what is in the strict line of legitimate argument, and, if his position is a delicate one, how much more difficult and delicate is ours? Notwithstanding no exceptions were taken at the time, we have, however, carefully examined the remarks of the attorneys as set out in the affidavits taken in connection with what the judge said, and we do not discover in them anything which would justify us in reversing the judgment. The remarks, though florid and full of invective, pertained to the issues of fact presented by the evidence. There were six speeches made to the jury, and we have only a few lines before us, taken from their context, and, in the very nature of things, the trial judge who heard all that was said, and the connection in which it was said, is more competent to determine the effect than we are, and we are not disposed to interfere with his rulings in that respect.

XI. In his motion for a new trial, the defendant filed several affidavits showing prejudice of some of the jurors, and the state filed counter affidavits negativing such prejudice. The court passed on the issue thus

raised, and it is not our province to interfere, it not appearing that the court abused its discretion. *State v. Gonce*, 87 Mo. 627; *State v. Cook*, 84 Mo. 40.

XII.   And the court properly refused to consider the affidavit of one of the jurors in regard to how a verdict was reached.   A juror will not be permitted to impeach his verdict in that way.   *State v. McNamara*, 100 Mo. 100; *State v. Rush*, 95 Mo. 199.

XIII.   The defendant asked leave to file an amended motion for new trial after the expiration of the four days allowed by law for filing such motions, setting up the improper interference of one of the state's attorneys in summoning talesmen to serve on the jury, which the court refused.   The court did right. *State v. Brooks*, 92 Mo. 542.

XIV.   And finally the defendant contends that, conceding that no single point he presents, being taken alone, would justify a reversal of the judgment, yet taking the whole conduct of the trial as shown by the record, it appears that he did not have a fair trial. The punishment inflicted on defendant being severe, we have given this proposition due consideration, and it seems to us the trial was fair in all particulars.   The defendant took a change of venue; he, by one means and another, continued the case from month to month, from June to November, 1889; he made an affidavit charging the sheriff with prejudice, and had him deposed and the coroner substituted, and the trial, which was ably conducted on both sides, lasted from the eleventh to the twentieth day of November, 1889.   The case was then continued on motion for new trial, and it was not overruled and defendant sentenced till the seventeenth of February, 1890.   Thus it appears that defendant invoked in his behalf every right the law guaranteed him, and the court proceeded with great deliberation becoming the gravity of the crime charged.

The record before us contains over eight hundred pages in type-writing, and shows that every inch of ground was contested. The issue of guilt or innocence was plainly and fairly put to the jury by the instructions.

The testimony of the prosecutrix, if she is to be believed, made out a most revolting case of rape. It is true that she did not show that "utmost resistance" which has been required in some cases, but those cases were where rape was claimed to have been committed by force alone. "The utmost resistance" doctrine does not apply where the woman is put in fear of personal violence, and her will thus overcome, or where intercourse is had with her by fraud, as by personating her husband, or where she is insensible from intoxication or drugs, etc. "A consent induced by fear of personal violence is not consent; and, though a man lay no hands on a woman, yet, if by any array of physical force, he so overpowers her mind that she does not resist, he is guilty of rape by having the unlawful intercourse." 2 Bishop on Criminal Law [7 Ed.] sec. 1125. "Consent, however reluctant, if free, negatives rape; but where the woman is insensible through fright, or where she ceases resistance under fear of death or other great harm (such fear being gauged by her own capacity) the consummated act is rape." 1 Wharton on Criminal Law [9 Ed.] sec. 557.

It was peculiarly the province of the jury to determine the weight to be given the respective stories advanced by the prosecutrix and the defendant, and they have seen proper to believe her instead of him, and we do not see how they could have very well done otherwise. Her story is decidedly the most probable of the two. He, according to his story, was entirely too passive and the prosecutrix too much like a strumpet of the most pronounced type. Her prompt report of

the crime in two hours after she left the saloon, and the circumstances under which it was made; her physical condition and the state of mental agitation she was in, strongly corroborate her statement and contradict his.

The punishment is not too severe for the crime the jury found was committed. The prosecutrix was a little over sixteen years old, a mere child, a thousand miles from father and mother and home, a stranger in a strange land, and the treatment the jury must have found she received in that saloon deserves condign punishment. The jury fixed that punishment at imprisonment in the penitentiary at thirty-five years, and we cannot say that that is excessive.

Believing that defendant had a fair trial, and that no substantial error was committed, the judgment is affirmed. All concur.