Argued 29 March, decided 28 April, 1905.

### · STATE *v.* LAUTH.

80 Pac. 660.

CRIMINAL LAW—SUDDEN FRENZY NOT INSANITY.

1. A sudden and frenzied paroxysm of anger or jealousy is not insanity in one otherwise in possession of his mental faculties, unaffected by heredity or disease, and does not relieve him from responsibility for crime.

JEALOUS RAGE—INSTRUCTIONS AS TO CRIMINAL RESPONSIBILITY.

2. A statement by the trial judge that jealous anger at the conduct of one's mistress is not insanity, and that the difference between the two is quite clear, is not error, particularly where the judge further offered to receive evidence tending to show insanity, or the condition of defendant's mind, together with information that had been communicated to him, and having instructed that the jury had a right to consider the condition of defendant's mind at the time of the homicide, as bearing on the degree of the offense.

TRIAL—QUALIFICATION OF JUROR AFTER TRIAL.

3. The conclusion by the trial judge as to the qualifications of a juror, when attacked by a motion for a new trial, or on appeal, will be set aside only when there has been an abuse of discretion.

REVIEWING QUALIFICATION OF JURORS AFTER TRIAL.

4. Where, after verdict, the proofs which are produced for and against the qualifications of a juror are conflicting, and of somewhat even balance, the court's conclusions will not be disturbed unless they may result in manifest injustice.

DETERMINING QUALIFICATION OF JURORS BEFORE TRIAL.

5. If a venireman should falsely state on his voire dire his interest or position, or should misstate or conceal a material relevant fact, he would be guilty of prejudicial misconduct.

EXAMPLE OF DISCRETION—QUALIFICATION OF JUROR.

6. On a prosecution for murder, defendant moved for a new trial on the ground that a juror had made false answers, in that he had stated that he had never heard anything about the case.  Defendant produced an affidavit that affiant, shortly after the coroner's inquest, met the juror in question, and talked with him, and told him all about the crime; and another affidavit stated that the juror admitted to affiant, in the presence of the one who had made the first affidavit, that the juror had talked with the latter about the case prior to the trial.  The affidavit of the juror stated that he had no recollection of having ever talked with any one about the crime, and that he had never admitted that he had done so; and another affidavit, made by the one who made the first-mentioned affidavit, stated that the juror never admitted in his presence that he had ever talked about the case.  Held, that it was not an abuse of discretion to deny the new trial.

From Clackamas: THOMAS A. McBRIDE, Judge.

Geo. W. Lauth prosecutes this appeal from a sentence of death for killing Mrs. Leonora B. Jones at Oregon City.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Geo. Clayton Brownell* and *Mr. Grant B. Dimick*.

For the State there was a brief over the names of *Harrison Allen,* District Attorney, and *C. Schuebel,* with an oral argument by *Mr. Andrew Murray Crawford,* Attorney General, and *Mr. Allen*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

The defendant was convicted of murder in the first degree for killing one Leonora B. Jones, his mistress, and adjudged to pay the penalty imposed by statute.  He interposed the plea of insanity at the trial, and, with a view to establishing the defense, called Charles R. Noblitt, who related that he was at the depot in Oregon City the night before the killing; that he did not see the defendant there, but saw him a little while afterwards.  Thereupon one of the counsel for the defendant stated that he desired to show the actions of the woman when she got off the train, with reference to another man, and that her conduct there was afterwards made known to the defendant, which

request the court denied, saying: "I do not think a man can set up, in a case of this kind, jealousy or anger or frenzy caused by jealousy—caused by the fact that a woman had abandoned him. I do not believe it is a good defense. If you can show this man was insane, it is a defense. But I do not think that the law recognizes that the abandonment of a man by his mistress is any legal provocation for taking her life. If you expect to offer any evidence tending to show that he was insane, the court will admit it."

Counsel then further stated that the woman came down on the train with certain parties, who were seen by two policemen, which fact was communicated to the defendant, and requested permission to show the subsequent acts of the defendant, answering which the court again ruled as follows: "I want to lay this down as the law: That a frenzy arising from jealousy or anger is not insanity. The difference between them, in law, is as wide as the poles. It is the duty of a man to control his passions, but he cannot control disease. I will admit anything that you can introduce to show the condition of this · defendant's mind— anything that was communicated to him. As I say, what the fact might be would not be material, but what was communicated to him might be material, with a view of determining what kind of a mind he had."

Objections were saved to these rulings and form the basis of the first assignment of error.

1. Insanity, to excuse crime, must be such as dethrones reason and renders the subject incapable of discerning right from wrong, or of understanding or appreciating the extent, nature, consequences, or effect of his wrongful act: *State* v. *Murray,* 11 Or. 413 (5 Pac. 55) ; *State* v. *Zorn,* 22 Or. 591 (30 Pac. 317). It has been said that "a mere uncontrollable impulse of the mind, coexisting with the full possession of the reasoning powers, will not warrant an acquittal on the ground of insanity; the question for the jury being whether the prisoner, at the time he committed the act, knew the character and nature· of the act, and that it was a wrongful one": *Regina* v. *Barton,* 3 Cox, C. C., 275, headnote. This appears to be the rule in England, The rule as it obtains in this country is lucidly but concisely

stated by Mr. McClain (1 Crim. Law, § 157) as follows: "As indicated in the preceding paragraph, there are some cases which lend countenance to the idea that an irresistible impulse to the commission of the crime will be an excuse; but in many cases, and, indeed, by a great weight of authority, irresistible impulse or uncontrollable passion is held not to be a defense. Where the criminal has sufficient mental capacity to distinguish between right and wrong, mere passion or frenzy produced by anger, jealousy or other passions will not excuse. There may, indeed, be insane impulses which are so far uncontrollable that there is no criminal liability therefor, but they must be shown to be the result of a diseased mind, and not merely of passion or impulse, though it is said in one case that uncontrollable impulses, due to provocation and disappointment, exaggerated by a disordered mind, might be taken into account to relieve the degree of homicide. But what is called moral or emotional insanity is distinctly repudiated as an excuse in perhaps all the cases in which such defense has been directly considered." In further support thereof, see *State* v. *Hansen,* 25 Or. 391 (35 Pac. 976, 36 Pac. 296) ; *Goodwin* v. *State,* 96 Ind. 550 ; *McCarty* v. *Commonwealth,* 24 Ky. Law Rep. 1427 (71 S. W. 656). Thus it is obvious that a paroxysm of jealousy, or sudden anger or frenzy of temper, provoked or superinduced by the intelligence that the accused had been abandoned by his mistress, the object of his lustful affections—he being otherwise in possession of his mental faculties, unimpaired by disease or unbalanced by heredity—will not relieve him of criminal responsibilty; and the trial court's rulings or observations were in accord with this understanding of the law. The rule was pithily stated, with something of epigrammatical emphasis, but there was no purpose manifest of attracting any particular attention to that phase of the case any more than to any other.

2. The court distinctly stated that any evidence tending to show insanity would be admitted, and, to that end, that it would allow the acts and conduct of the defendant to be proven, as well as any communications made to him relative to the deportment of the woman. This gave ample scope for maintaining the defense interposed, and, when taken in connection with

the general charge that the jury had a right to take into consideration the condition of mind of the defendant at the time he committed the homicide, as bearing upon the degree of the offense of which he was guilty, it is manifest that there was no error of which he could complain.

The only other error assigned arises from the conduct of John Page, who sat on the jury. The following is his examination, and the answers elicited on his voir dire:

"Q. I will ask you if you have heard or read anything about this case? ·

A. No, sir

Q. Did you read anything about it in the newspapers at the time it is alleged to have happened?

A. No, sir; I believe not.

Q. You knew there was such a case on the docket, did you?

A. I did.

Q. I will ask you if, on or about the 6th day of September, when this alleged offense is supposed to have happened, if you heard the matter discussed any?

A. No, sir.

Q. Then you know nothing about what purports to be the facts in this case?

A. Not a thing.

Q. I will ask you, if you were accepted as a juror in this case, you'd be willing to go into the jury box and eliminate any impression, if you have one, as to the guilt or innocence of the defendant, and try the case solely upon the evidence, and the law as given you by the court?

A. Yes, sir."

Being accepted by the defendant, the district attorney further examined him as follows:

"Q. Have you any conscientious scruples against the infliction of capital punishment for murder?

A. Not at all.

Q. Have you ever been a close friend of Mr. Brownell or Mr. Dimick?

A. No, sir.

Q. Are you acquainted with any of the witnesses in the case?

A. Carll is the only one I know. I don't know any of them, only Carll.

Q. Do you know any reason why you could not give both sides an absolutely fair and impartial trial?

A. I could.

Q. You could?

A. Yes, sir.

Q. Have you no opinion at all?

A. None whatever."

After verdict the defendant moved to set it aside and for a new trial on the ground, as alleged, that the juror made false answers to the questions thus propounded to him touching his qualifications to sit as a trior in the cause, and therefore he was not accorded a trial by a fair and impartial jury. To prove the falsity charged, the affidavits of Henry W. Trembath and G. B. Dimick, one of the counsel for the defendant, were produced. Trembath is a constable, and took charge of the defendant very soon after the tragedy; receiving him from the father of the deceased, who then had him in custody. He swears that, immediately after he received the defendant into his custody, the defendant informed him that his (defendant's) gun or pistol, which he then had in his pocket, contained only one loaded shell, and that he had shot four loads into the body of the deceased; that he (affiant) was subpœnaed as a witness, and testified before the coroner's jury relative to what the defendant had told him; that immediately after the inquest he met Page, the juror, in front of the courthouse, and there talked with him, and told him all about the shooting of the deceased, and also what the defendant had told him (affiant) in regard to the loaded and empty shells remaining in the pistol, and, in fact, all that he had testified to before the coroner's jury. Further, he swears that he related to him all the facts, as he (affiant) understood them, leading up to the homicide; that thereafter, about the last of September, 1904, affiant again met Page in the sheriff's office, and there talked with him about the shooting, wounding, and killing of the deceased by the defendant; that the affiant was in the courthouse when Page was drawn on the panel as a juror; that he was asked, while being examined touching his qualifications, if he was acquainted with any of the witnesses for the State (the names on the information being read to him at his request, that of affiant among the rest) ; and that he answered that Dr. Carll was the only one. The affiant further deposed that he had been acquainted with Page for a long time

prior to the date of the killing. Dimick deposes that on or about December 1, 1904, Page admitted to him, in the presence of Trembath, that he had talked with the latter about the case prior to the trial.

In refutation of this showing on the part of the defense, the State produced the affidavit of Page, and another from Trembath. Page avers that he has no recollection of ever having talked with Trembath or any other person about the shooting of deceased by defendant; that he had not at any time expressed an opinion as to the guilt or innocence of the defendant to any person or persons; that he had no knowledge of the facts, or of what purported to be the facts, relative to the homicide, prior to hearing the evidence at the trial; that he never admitted to having talked with Trembath or any other person about the facts of the shooting in the presence of Dimick and Trembath, or any other person or persons; that he never knew Trembath by the name of Henry W., but was slightly acquainted with him by the name of Harry, by which latter he was commonly known; and that, when the name Henry W. Trembath was read to him from the information, he did not know that it referred to the same person as Harry Trembath. Trembath avers that he was in the office of Dimick at the time referred to by the latter in his affidavit, and that Page never stated at that or any time, in his presence, or in the presence of Dimick and himself, that he had ever talked with Trembath about the case, nor did he in any manner admit the same. This constitutes all the material proofs pro and con touching the alleged misconduct of the juror.

3. The exact function of the trial court as a trior of a juror's qualifications before trial, and the principle upon which its action in that regard may be revised, have been firmly settled in this State: *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441) ; *State* v. *Armstrong,* 43 Or. 207 (73 Pac. 1022). As the trior of a juror's qualifications after verdict, when attacked for bias or prejudice rendering him unfit to sit in the cause, the function of the court is much the same as when it is sitting to make the inquiry before trial. It is held to the exercise of a sound legal discretion, and is amenable to revision only when it has abused that discretion. The reason commonly assigned for the

rule is that the trial court has the opportunity of seeing the juror, of hearing him give his testimony, and of noting his manner and demeanor while under examination; thus affording it advantages superior for determining the matters of inquiry to those accorded the appellate tribunal, which is furnished only with the dry facts upon paper. The rule is otherwise stated as requiring clear and palpable proofs to warrant a reversal of the trial court's determination.

4. It follows, therefore, that, where affidavits and proofs are produced for and against, which are conflicting and contradictory, and of somewhat even balance, so that it requires a precise estimate to determine as to the greater weight or preponderance, the trial court's conclusions will not be disturbed, unless they may result in manifest injustice: 17 Am. & Eng. Enc. Law (2 ed.), 1209; *Ray* v. *State,* 15 Ga. 223, 241; *Brinkley* v. *State,* 58 Ga. 296; *Stewart* v. *State,* 58 Ga. 577; *Vann* v. *State,* 83 Ga. 44 (9 S. E. 945); *Long* v. *State,* 95 Ind. 481, 486; *Hodges* v. *Bales,* 102 Ind. 494 (1 N. E. 692); *Epps* v. *State,* 102 Ind. 539 (1 N. E. 491); *De Hart* v. *Etnire,* 121 Ind. 242 (23 N. E. 77); *State* v. *Lee,* 80 Iowa, 75 (45 N. W. 545, 20 Am. St. Rep. 401); *Wightman* v. *Butler County,* 83 Iowa, 691 (49 N. W. 1041); *Hull* v. *Minneapolis St. Ry. Co.* 64 Minn. 402 (67 N. W. 218); *Svenson* v. *Chicago, G. W. R. Co.* 68 Minn. 14 (70 N. E. 795); *State* v. *Gonce,* 87 Mo. 627; *Kennedy* v. *Holladay,* 105 Mo. 24 (16 S. W. 688); *State* v. *Dusenberry,* 112 Mo. 277 (20 S. W. 461); *State* v. *Howard,* 118 Mo. 127, 136 (24 S. W. 41); *State* v. *Taylor,* 134 Mo. 109, 161 (35 S. W. 92).

5. The rule, on principle, must necessarily be the same where the court is sitting to inquire touching alleged misconduct of a juror. Mr. Chief Justice ELLIOTT, in *Pearcy* v. *Michigan Mut. L. Ins. Co.* 111 Ind. 59, 61 (12 N. E. 98, 99, 60 Am. Rep. 673), says, with great force and obvious justice, that "the examination of a juror on his voir dire has a twofold purpose, namely, to ascertain whether a cause for challenge exists, and to ascertain whether it is wise and expedient to exercise the right of peremptory challenge given to parties by the law. It is often important that a party should know the relation sustained by a person called as a juror to his adversary, in order that he may

interpose a challenge for cause, or exercise his peremptory right to challenge. It is the duty of a juror to make full and truthful answers to such questions as are asked him, neither falsely stating any fact nor concealing any material matter, since full knowledge of all material and relevant matters is essential to a fair and just exercise of the right to challenge either peremptorily or for cause. A juror who falsely misrepresents his interest or situation, or conceals a material fact relevant to the controversy, is guilty of misconduct, and such misconduct is prejudicial to the party, for it impairs his right to challenge": *Johnson* v. *Tyler,* 1 Ind. App. 387 (27 N. E. 643). The accused has a constitutional right to a trial by a fair and impartial jury, and ought not, therefore, to be compelled to submit to be tried by a juror who insinuates himself upon the panel by falsifying his oath. So we take it, without further inquiry or citation of authority, that if the juror Page, when asked on his voir dire if he had heard or read anything about the case, or if he had heard the matter discussed, or knew anything about what purported to be the facts in the case, or was acquainted with any of the witnesses, answered falsely, so as to deprive the defendant of his right of peremptory challenge, or of questioning him more rigidly relative to the real facts which might have influenced his mind and determined the court as to his competency as an impartial juror, then his acts amounted to misconduct manifestly prejudicial to the defendant, as they have deprived him of a clear legal right. We think, also, we may assume that the juror, by answering falsely, if such he did, had some ulterior motive to subserve. Whether it was to convict or to acquit the defendant is not apparent, but it does not matter—the result of his verdict was to convict—and who could say that he went into the box with a different purpose or wholly unbiased?

6. Did the juror, therefore, answer falsely? For such is the misconduct charged against him. The solution of this question depends almost entirely upon the affidavit of Trembath and the counter affidavit of Page. Between these there is a sharp conflict in statement. The juror has a right to be heard upon his own affidavit, and the trial court may look back to the examina-

tion on his voir dire, and, considering the whole, determine the controversy. As to the controlling feature sworn to by Trembath—that he had talked with Page, and told him about the pistol and the shells, and the facts as he understood them—Page replies by saying that he has no recollection of either circumstance, or of having talked with any one about the case prior to the trial. He might have denied by positive statement, which would have strengthened his defense, and, not having done so, it leaves an impression that he could not conscientiously so depose. It is hardly possible, however, that he should have forgotten within such a short space of time a matter which would naturally impress itself upon his mind, and it is a fair inference that he knew when he filed his affidavit whether Trembath had previously talked with him or not, and he is not to be excused on account of a short memory. When, therefore, he asserts that he retains no recollection of Trembath's having talked with him, the statement is persuasive and cogent in repudiation of the charges made by Trembath. Page's statement on the voir dire, however, is positive that he had never heard anything about the case, and knew nothing of the facts; and this was very recently after the conversation should have taken place, according to the showing of Trembath. Further, there is a weakness in Trembath's statement. He does not aver that Page made any reply when being told of the alleged facts of the killing, either by way of expressing an opinion, or letting fall any observation about the matter. One would naturally suppose that he would have said something affecting his qualifications as a juror, of a nature pertinent to have been set out along with the other facts. All this, however, by way of a discussion of the relative probabilities of truth in these contradictory and conflicting affidavits. The incident of Trembath's alleged acquaintance with Page is of minor moment, and is satisfactorily explained by the latter.

The affidavit of Mr. Dimick is admittedly disparaging to the juror's answers on his voir dire, but the latter denies the statement in positive terms, and Trembath, who was present at the time alluded to, corroborates the denial, so that, considering the whole testimony pro and con bearing on the dispute, there is

something of an even balance. It falls far short of a clear and palpable showing that the juror has been guilty of misconduct as alleged, and the trial court, with more favorable opportunity to detect imposition and discover truth, having passed upon the proofs, we must take it, under the authorities, that it has righly and justly decided the question involved. We cannot, therefore, interfere with its legal discretion in the premises. *State* v. *Cook,* 84 Mo. 40, and *State* v. *Gonce,* 87 Mo. 627, afford apt illustrations and discussions of the consideration and weight to be accorded to conflicting affidavits introduced for the establishment of a fact in dispute. A trial of fact by affidavit is not so felicitous in the discovery of truth as where the witness may be subjected to the search of a cross-examination for the verification of his statements, and the ascertainment of any motive present that may go to the impairment of his credibility. Accordingly, courts have enjoined the observance of caution in acting upon testimony adduced by that method, and usually agree that the case should be distinctly and clearly made, where it is sought to have a verdict set aside and a new trial awarded, for it is, in a manner, impeaching the regularity of a judicial proceeding: *Hughes* v. *People,* 116 Ill. 330 (6 N. E. 55) ; *Spies* v. *People,* 122 Ill. 1, 264 (12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320) ; *Lamb* v. *State,* 41 Neb. 356 (59 N. W. 895) ; *Hill* v. *State,* 42 Neb. 503 (60 N. W. 916).

Finding no error, therefore, in the rulings of the circuit court, its judgment will be affirmed.                              AFFIRMED.