**STATE of Missouri, Respondent,**

v.

**Jerry Rodger BECK, Appellant.**

**No. 49665.**

Supreme Court of Missouri,

Division No. 1.

June 4, 1963.

Wm. J. Hill, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., John H. Denman, Asst. Atty. Gen., Jefferson City, for respondent.

HOLMAN, Commissioner.

Defendant, Jerry Rodger Beck, was found guilty of forcible rape and his punishment fixed by the jury at five years' imprisonment in the penitentiary. See Section 559.260 RSMo 1959, V.A.M.S. He has appealed from the ensuing judgment.

The sole point briefed by defendant upon this appeal is that the evidence is insufficient to support the conviction and hence the trial court should have sustained his motion for a judgment of acquittal filed at the close of all the evidence. He specifically contends that there was no substantial evidence of actual or constructive force at the time of the act of intercourse and that the evidence discloses that prosecutrix did not make the

utmost resistance of which she was capable as required by law.

As will hereinafter appear, it is conceded that the act of intercourse was accomplished without the use of actual physical force on the part of defendant (since his identity is not questioned here we will assume that defendant is the man involved in this occurrence) and that prosecutrix did not offer any substantial physical resistence. It is the theory of the State that the utmost resistance doctrine does not apply in this case because prosecutrix submitted to defendant's demands because of fear which resulted from threats of great bodily harm to her and her baby.

The principal evidence relating to the issues presented upon this appeal is contained in the testimony of prosecutrix. She testified that at the time in question, April 12, 1962, she was 21 years of age, married, and the mother of two small children, one three years of age and the other four months; that she resided with her husband on East 152nd Street in Grandview, Missouri, in a housing development area where the houses were rather close together; that at 2 p. m. on April 12, defendant knocked at her door and asked the directions to Highway 71, and that she gave him the directions and he returned to his car; that a little later defendant again knocked on the door and asked to use the telephone; that she permitted him to enter her home and use the telephone which was located in the kitchen and then accompanied him to the front door; that she then stated to defendant that she was going to turn down the volume on the television set which was located near the door; that as she worked with the television set defendant approached her from behind; he "grabbed me around —around my busts, and he put a knife to my throat" and said, "Well, I have a better idea"; that she told defendant she wasn't feeling good and had to sit down and defendant permitted her to do so; that both of her children were then asleep in separate bedrooms; that after she sat down she asked defendant what he wanted, and he said, "You know what I want"; that she then attempted to dissuade him by offering to let him take their car or their money or anything in the house if he would get out and leave her alone, and he replied, "No, you know what I want"; that at that point her baby began to cry and defendant told her to go get the baby, which she did; that she then told defendant the baby was hungry and she had to fix a bottle; that she laid the baby on the couch in the living room and defendant went with her to the kitchen while she started heating a bottle of milk; that she knew the baby was not hungry but she was stalling the defendant hoping that someone would come to the house or that she could get help; that when they returned to the living room defendant took hold of her right wrist and pulled her up from the divan and as he motioned toward the bedroom he said, "Come on, let's go"; that she refused to go and defendant then pointed a knife at the baby and said, "You wouldn't want anything to happen to her, would you"; that she was then in fear for the life of her child; that he again told her to go to the bedroom, and "I asked him if he would put the knife away, and he says, 'Why do you want me to put the knife away?' and I said, 'I don't like knives, it scares me.' And he says, 'I'll lay the knife on the television, but you go on in the bedroom.' And I just stood there in front of him, and he motioned for me to go on around in front of him; and I did, and as I went by the television he laid the knife on it." She stated that she was in fear at that time and had been in fear since he had first exhibited the knife. "Q. You were in fear from that moment until the time—or in fact all the time he was there, is that right? A. I was afraid from the time he pulled the knife until the time he left. Q. Were you in fear for anyone other than your own person? A. Yes, I actually believed that he would have killed all of us."

The prosecutrix testified further that after they entered the bedroom defendant directed her to take off all her clothes, which she did. She then described what oc-

curred in the bedroom in the following manner: "Q. Now you state that this man who entered your home forced you into the bedroom and forced you to disrobe, and you were sitting on the bed; what happened then, please? A. He told me to lay back on the bed. Q. And did you? A. Yes. Q. And then what happened, please? A. Well, he told me to scoot up, and not to look. Q. And what happened then? A. Well, he unzipped his pants and laid down. Q. And what did he do then, please? A. He told me to put it in. Q. And did you? A. Yes, I did. Q. And by that do you mean that you inserted his private parts into yours? A. Yes, sir. Q. And did he thereafter complete the act of intercourse with you? A. Yes. Q. And what did he do then? A. He got up, zipped his pants up, and he said, 'That wasn't so bad, was it?' Q. And at the time this occurred were you still in fear? A. Yes, I was. Q. For anyone's life but your own? A. Yes, my two children. Q. All right, what happened then, did he leave, or did you leave, or— A. I ran to the front door and held the door open and stood behind it, and he walked down the hall and he came to the front door and he turned around and he says, 'Oh, fingerprints,' and he went to the kitchen and I heard him wiping the fingerprints off of the phone. Q. And did he thereafter leave? A. He came in and he said, as he got to the door, 'Don't call the police' he says, 'or I'll come back and kill you, because I know where you live.' Q. What did you do then? A. When he went out the door I slammed the door and ran to the bathroom. Q. And did what? A. I tried to take a douche. Q. And then what did you do, please? A. I ran next door to the neighbor's house. Q. And how were you dressed at that time? A. I had on pants. Q. Nothing else but—what type, toreador pants? A. Yes, toreador pants."

Prosecutrix' neighbor, Mrs. DuBois, testified that on the afternoon in question prosecutrix knocked on her door and she let her in; that she was wearing only a pair of toreador pants and that prosecutrix fell to the floor crying and screaming and told her that she had been raped; that she suggested that they call the police and prosecutrix said, "No you can't call the police because he said he would come back and kill the entire family." Mrs. DuBois stated that she then called prosecutrix' sister who came and took her to the office of her physician.

Dr. Doane testified that he examined prosecutrix in his office on the afternoon of April 12, 1962; that she was in shock and was hysterical, but that he was able to calm her to the extent that she could give a statement to the police while in his office; that he found live sperm in the vaginal tract; that prosecutrix was normally a very stable person.

Prosecutrix was able to give the police a detailed description of the person who had entered her home and also a description of his automobile which contained some very unusual markings. The police gave the description of the automobile to service station operators in the area and defendant was apprehended shortly after his automobile was observed by a filling station operator who reported the license number to the police. After his arrest he was positively identified by prosecutrix on a number of occasions and that identification is not questioned upon this appeal.

Defendant did not testify. He offered the testimony of Mrs. Ruby Walker and her stepson, Roy McKinney, who lived near the home in which he resided, which testimony tended to support a defense of alibi.

In determining the question as to the sufficiency of the evidence to sustain a conviction we view the evidence in the light most favorable to the State. State v. Smart, Mo.Sup., 328 S.W.2d 569. As we have indicated, it is the contention of the State that the utmost resistance doctrine, when considered in a physical sense, has no application in this case. It is apparent from the foregoing statement of the evidence that defendant used no substantial force in accomplishing his purpose and prosecutrix did

not offer any physical resistance. If defendant is guilty of the crime of rape it must be on the theory that the submission of prosecutrix was reasonably induced by fear of injury to herself and her baby if she resisted defendant's demands.

■ We have concluded that the evidence herein is sufficient to have reasonably supported a jury finding that prosecutrix submitted to defendant's demands and followed his directions because of fear of great bodily harm to herself or her children in the event she had physically resisted his determination to have intercourse with her.

The applicable rule is stated in 44 Am. Jur., Rape, § 5, p. 904, as follows: "The term 'by force' does not necessarily imply the positive exertion of actual physical force in the act of compelling submission of the female to the sexual connection; but force or violence threatened as the result of noncompliance, and for the purpose of preventing resistance, or extorting consent, if it is such as to create a real apprehension of dangerous consequences, or great bodily harm, or such as in any manner to overpower the mind of the victim so that she dare not resist, is, and upon all sound principles must be, regarded, for this purpose, as in all respects equivalent to force actually exerted for the same purpose. Nor need the threats be of force to be used in accomplishing the act. In fact, it would seem that the requirement in reference to force is satisfied by any sexual intercourse to which the woman may have been induced to yield, only through the constraint produced by the fear of great bodily harm or danger to life and limb, which the defendant, for the purpose of overcoming her will, caused her to apprehend, as the consequence of her refusal, and without which she would not have yielded."

■ This court stated long ago that "the 'utmost resistance' doctrine does not apply where the woman is put in fear of personal violence, and her will thus overcome * * *. 'A consent induced by fear of personal violence is not consent; and though

a man lay no hands on a woman, yet if, by an array of physical force, he so overpowers her mind that she does not resist, he is guilty of rape by having unlawful intercourse.' Bish.Crim.Law, (7th Ed.) § 1125." State v. Dusenberry, 112 Mo. 277, 20 S.W. 461, 466. Other cases tending to support our decision herein are State v. Schuster, Mo.Sup., 282 S.W.2d 553; State v. Wynn, Mo.Sup., 357 S.W.2d 936; State v. Moore, Mo.Sup., 143 S.W.2d 288; and State v. Catron, 317 Mo. 894, 296 S.W. 141.

■ The main contention made in defendant's brief is that, at the request of prosecutrix, defendant left his knife in the living room and therefore, after prosecutrix entered the bedroom, no constructive force was being exerted by defendant and prosetrix was then under a duty to make the utmost physical resistance to prevent penetration. We do not agree. Defendant had shown a determined purpose to have intercourse with prosecutrix. His conduct and statements would reasonably instill in prosecutrix the belief that if she resisted he would use his knife in inflicting great bodily harm to her or the baby, or both. The fact he did not have the knife with him in the bedroom would not have prevented such conduct. Had prosecutrix resisted him defendant could have returned to the living room in a few seconds and obtained his knife. He could then have used (or threatened to use) the weapon upon the baby or upon prosecutrix. Her submission to defendant's directions in removing all of her clothing and in actively cooperating with him in effecting a penetration was substantial evidence tending to demonstrate that she was motivated by an intense fear throughout the time she was in the bedroom. Certainly it may not be said as a matter of law that prosecutrix wilfully consented to expose herself and to so completely cooperate in the sexual act with this intruder in her home whom she had never seen before and who had, by inference, threatened her life and that of her child. Under all the facts and circumstances it was for the jury to determine whether or not

she submitted to defendant's demand for intercourse as a result of fear or whether she had consented by voluntarily yielding her will to the commission of the act. We therefore rule that the court did not err in overruling the motion for a judgment of acquittal.

Most of the cases cited by defendant involve factual situations where no threats were made and in which the doctrine of utmost physical resistance was properly applied. See, for example, State v. Remley, Mo.Sup., 237 S.W. 489, State v. Perkins, 11 Mo.App. 82, and Champagne v. Hamey, 189 Mo. 709, 88 S.W. 92. Cases of that type have no application to the factual situation here involved.

An examination of the record as required by S. C. Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.