Argued March 18, modified July 6, 1926.

# H. S. MOUNT *v.* O. A. WELSH ET AL.

## (247 Pac. 815.)

**Appeal and Error.**

1. Determination of juror's competency is primarily for trial court.

**Jury.**

2. Under Section 123, Or. L., opinion on merits of cause, formed or expressed by juror from what he has heard from neighbors and newspaper reports, is alone insufficient to sustain challenge.

**Jury.**

3. Test of juror's disqualification is probability of interest, prejudice or bias, as determined by application of court's judicial knowledge to facts.

**Jury.**

4. "Competent juror" is one who is impartial and indifferent as to parties and cause.

**Jury.**

5. That statute provides certain grounds for challenge does not preclude challenge and exclusion of juror on other grounds.

**Jury.**

6. Bias cannot be implied from mere relationship of physician and patient, but opinion of strong-minded juror that his family physician should prevail in case involving his learning and skill generally disqualifies (§ 122, Or. L.).

**Jury.**

7. Defendant cannot complain of overruling of challenge for cause until his peremptory challenges are exhausted.

**New Trial—Jurors' Counter-affidavits, Denying Statements Attributed to Them in Affidavits Supporting Motion for New Trial, Held Competent in Rebuttal.**

8. Jurors' counter-affidavits, denying statements attributed to them in affidavits supporting defendants' motion for new trial on ground of their misconduct, *held* competent to rebut matter in such affidavits.

**Appeal and Error—New Trial—Granting New Trial, for Juror's Misconduct or Disqualification is Within Court's Discretion, and will not be Reversed or Set Aside, Except for Manifest Abuse.**

9. Granting new trial for misconduct or disqualification of juror is within discretion of trial court, whose determination will not be reversed or set aside on appeal, except for manifest abuse.

---

2. See 16 R. C. L. 263.
7. See 16 R. C. L. 291.
9. See 20 R. C. L. 252.

New Trial—Defendants Held not Entitled to New Trial for Bias of Juror, Practicing No Deception in Qualifying, and Passed Without Questioning as to Bias.

10. Where juror, whose remarks after verdict for plaintiff indicate bias against defendant, practiced no deception in qualifying, but testified that he knew defendant, whose attorney asked no questions as to bias, but passed him for cause, defendants were not entitled to new trial on such ground.

Counties—County is Mere Auxiliary of State Government and Immune from Liability Without Its Consent, Except by Statute.

11. County is mere auxiliary of state government, and partakes of state's immunity from liability without its consent, except as imposed or authorized, expressly or impliedly, by statute.

Witnesses—Professional Witness, Such as Physician, may be Compelled to Attend Court, and Testify to What He Knows, for Same Statutory Fees as Other Witnesses.

12. Professional witness, such as physician and surgeon, may be compelled to attend court in obedience to subpoena, and testify to what he knows, for same statutory fees as other witnesses.

Witnesses—Physician and Surgeon Obeys Subpoena by Appearing and Giving Impromptu Answers to Questions, and cannot be Required to Examine into Case and Use Skill and Knowledge to Form Opinion.

13. Physician and surgeon meets requirements of subpoena by appearing in court, and giving impromptu answers to questions, and cannot be required to examine into case and use his skill and knowledge to form opinion.

Coroners.

14. Physician and surgeon, conducting post-mortem examination under coroner's direction, may be allowed reasonable compensation.

Coroners—Payment of Physician Whose Post-mortem Examination was Made at Request of Decedent's Relatives, but Whose Claim was Approved by Coroner and Allowed by County Court, Held Authorized.

15. Where physician, making post-mortem examination at request of decedent's relatives, later testified before coroner, and claim for compensation was approved by coroner and made part of his return, County Court allowed it, and warrant in payment thereof was issued, the ratification of the implied contract to pay authorized the payment.

Counties—County, Through Proper Officers, may Ratify Unauthorized Contract, Which It Could have Made in First Instance, and Ratification is Equivalent to Original Authority.

16. County, through its proper officers, may ratify unauthorized contract which it could have made in first instance, and such ratification is equivalent to original authority.

Pleading—Motion to Strike Allegations of Complaint as to Colloquial Meaning of "Profiteering" and "Graft" Held Properly Disallowed.

17. In action for libel in protest to County Court against allowance of physician's claim for post-mortem examination fee, motion to strike allegations of complaint as to colloquial meaning of words "profiteering" and "graft" in vicinity *held* properly disallowed.

Libel and Slander—Word "Profiteering" in Protest Against Allowance of Physician's Claim for Post-mortem Examination Fee Held Used as Term of Reproach and Dishonor.

18. Written protest to County Court against allowance of physician's claim for post-mortem examination fee on ground that "such attempted graft and profiteering" should not be countenanced, "as it reflects upon the medical profession," *held* to use term "profiteering," which involves acquisition of excessive profits, as term of reproach and dishonor.

Libel and Slander—"Graft" as Used in Written Protest Against Physician's Claim for Post-mortem Examination Fee, Means Personal Gain Received Without Compensatory Services by One Holding Position of Trust and Confidence, or Dishonest Transaction in Relation to Public or Official Acts, and Implies Theft, Corruption, Dishonesty, Fraud or Swindle, and Want of Intregity.

19. "Graft," as used in written protest to County Court against allowance of physician's claim for post-mortem examination fee, designates advantage or personal gain received because of peculiar position or superior influence of one holding position of trust and confidence without rendering compensatory services, or dishonest transaction in relation to public or official acts, and sometimes implies theft, corruption, dishonesty, fraud or swindle, and always want of integrity.

Appeal and Error—Permitting Witnesses to Define Term "Graft" in Libelous Writing Held not Reversible Error, Where Accuracy of Definitions was not Questioned.

20. Permitting witnesses to define term "graft as used in written protest against allowance of physician's claim for post-mortem examination fee *held* not reversible error, though unnecessary, where accuracy of definitions was not questioned.

Appeal and Error—Refusal to Permit Defendant to Testify as to Circumstances to Which Other Defendants Later Testified, Held not Prejudicial.

21. In libel suit, defendants were not injured by refusal to permit one of them to testify as to circumstances under which each signed libel, on cross-examination when called by plaintiff, where other defendants later testified to all of such circumstances.

Witnesses—Cross-examination of Plaintiff Physician's Nurse as to Her Salary Held Improper, as Relating to Collateral Matter.

22. In action for libel in written protest to County Court against allowance of physician's claim for post-mortem examination fee, plaintiff's objection to cross-examination of his nurse as to her salary, which was collateral matter, was properly sustained.

Witnesses—Stenographer Testifying That Notes of Testimony Before Coroner's Jury were Lost or Destroyed, Held Properly Permitted to Read from Extension, Which He Swore was Correct.

23. Stenographer, testifying that his notes of testimony before coroner's jury had been lost or destroyed, but that he had correct extension thereof, was properly permitted to testify therefrom, where he had no independent recollection of such testimony.

Trial—Refusal to Permit Defendant Physician, Who had Testified as to Hospital Chart, to Show That It had Been Tampered With in Rebuttal to Testimony of Plaintiff Physician's Nurse, Held not Abuse of Discretion.

24. Where physician, sued for libel in charging misleading testimony by plaintiff physician before coroner's jury as to cause of death, had testified as to hospital chart, court did not abuse discretion in refusing to allow him to show that it had been tampered with in rebuttal to testimony of plaintiff's nurse.

Pleading.

25. Permitting plaintiff, in libel suit, to amend pleading, *held* within court's discretion under Section 102, Or. L.

Evidence.

26. Extrajudicial admission against interest in original pleading is available as evidence after amendment thereof.

Pleading.

27. Court properly instructed jury that only existing pleadings were pleadings as finally amended.

Counties—County Court may not Pay Bill Because They Deem It in Interest of Public Justice.

28. County Court may not pay bill, merely because they deem it in interest of public justice, and instruction that they might was erroneous, whether claim is proper charge against county and one which court may lawfully approve, being determined by statute.

Counties—County Court is Court of Inferior Jurisdiction, Whose Right to Pay Claim Rests on Law, not Their Judgment.

29. County Court is court of inferior jurisdiction, whose duties are defined by law, and right to pay claim rests, not on their judgment, but on law.

Counties.

30. County Court's discretion in allowing claims payable from public funds is legal, not personal.

Libel and Slander—Trial.

31. In suit for libel in written protest to County Court against allowance of physician's claim for post-mortem examination performed for family and testified about before coroner, instructions as to payment for services in getting ready to testify before coroner's jury and reasonableness of charges for autopsy held erroneous, as abstract, and leading jury to conclude that size, not lawfulness, of bill, was question, and that plaintiff had made special preparation on county's behalf to testify.

Appeal and Error—Abstract Instructions are Misleading and Mischievous, Though Causes will not Always be Reversed for Error Arising Therefrom.

32. Causes will not always be reversed for error growing out of abstract instructions, but such instructions, though correct in themselves, are misleading and mischievous as tending to draw jurors' minds away from real facts in issue.

Libel and Slander—Purpose of Act, Authorizing Allegation and Proof of Circumstances Mitigating Damages, is to Give Defendant, Erring in Good Faith, Benefit of Palliatory Circumstances (§ 92, Or. L.).

33. Purpose of Section 92, Or. L., authorizing defendant in libel suit to allege and prove circumstances mitigating damages, as well as truth of defamatory matter, is to give defendant, erring honestly and in good faith, benefit of palliatory circumstances.

Libel and Slander—Refusal of Instruction to Consider Defendants' Good Faith in Mitigation of Damages Held Erroneous.

34. In libel suit, wherein defendants alleged circumstances mitigating damages, as well as truth of charges, court erred in refusing instruction to consider their good faith in mitigation of damages, though communication was not privileged nor proven true.

Appeal and Error—Supreme Court, Finding Material Error of Law, may Retry Case, and Render Proper Judgment, if Possessed of Sufficient Information, as Where All Evidence is Reported (Const., Art. I, §§ 1, 10, and Art. VII, § 3-c).

35. Under Constitution, Article I, Sections 1, 10, and Article VII, Section 3-c, Supreme Court, finding material error of law, may retry case on record, and enter proper judgment, if it possesses sufficient information, as where evidence is reported in entirety.

Libel and Slander.

36. In libel suit, facts tending to prove charge, though insufficient for such purpose, may be considered in mitigation of damages.

Libel and Slander—One, Acting Under Sense of Duty in Making Communication, Which He Reasonably Believes to be True, must not Make Exaggerated, Unwarrantable, or Malicious Statements not Justified by Occasion.

37. One, speaking honestly for common good, must be protected; but one, acting under sense of duty in making communication, which he reasonably believes to be true, must not make exaggerated, un-. warranted or malicious statements; privilege extending to nothing not justified by occasion.

Libel and Slander — Charges in Protest to County Court Against Allowance of Physician's Claim for Usual Post-mortem Examination Fee That He Wilfully, or With Gross Ignorance, Gave False Testimony Before Coroner's Jury, and was a Grafter, and Profiteering, Held not Privileged.

38. Charges in protest to County Court against allowance of physician's claim for usual fee for post-mortem examination, which he made at request of decedent's family, who asked coroner to assume bill for county, and were not shown to be financially irre-

sponsible for amount, that he wilfully or with gross ignorance gave false testimony before coroner's jury as to cause of death, and was a grafter, and profiteering, *held* not privileged.

**Libel and Slander—Physician Held Entitled to $5,000 Damages for Defamatory Charges That He Wilfully, or With Gross Ignorance, Gave False Testimony Before Coroner's Jury, and was a Grafter and Profiteering.**

39. Physician *held* entitled to $5,000 damages for defamatory charges by other physicians in protest to County Court against allowance of claim for post-mortem examination fee that he wilfully, or with gross ignorance, gave false testimony before coroner's jury, and was a grafter, and profiteering.

Appeal and Error, 4 C. J., p. 811, n. 55, p. 911, n. 74, p. 952, n. 85, p. 962, n. 47, p. 968, n. 37, p. 969, n. 40, p. 1033, n. 37, p. 1036, n. 67, p. 1188, n. 93.
Constitutional Law, 12 C. J., p. 1292, n. 14.
Coroners, 13 C. J., p. 1250, n. 88.
Counties, 15 C. J., p. 389, n. 9, p. 554, n. 84, p. 653, n. 32, 33, 41, p. 654, n. 42, 43 New, p. 663, n. 47.
Evidence, 22 C. J., p. 337, n. 58, 59, p. 1050, n. 25.
Graft, 28 C. J., p. 756, n. 9, 12, p. 757, n. 13, 14, 15, 18, 19, 20, 21, 22, 23, 24, 25.
Juries, 35 C. J., p. 312, n. 97, p. 327, n. 37, 38, 39, p. 328, n. 43, p. 332, n. 15 New, p. 343, n. 1, 2, p. 344, n. 13, p. 345, n. 14, p. 372, n. 7, p. 382, n. 77.
Libel and Slander, 36 C. J., p. 1187, n. 28, p. 1248, n. 66, 67, 37 C. J., p. 22, n. 12, p. 47, n. 22, p. 62, n. 39, p. 69, n. 48, p. 80, n. 65, p. 97, n. 50, p. 110, n. 44.
New Trial, 29 Cyc., p. 766, n. 52, p. 768, n. 63, p. 770, n. 73, p. 999, n. 83, p. 1009, n. 54.
Pleading, 31 Cyc., p. 368, n. 9.
Profiteer and Profiteering, 32 Cyc., p. 592, n. 56 New.
States, 36 Cyc., p. 911, n. 45
Trial, 38 Cyc., p. 1595, n. 90, p. 1612, n. 14, p. 1614, n. 17, p. 1620, n. 39.
Witnesses, 40 Cyc., p. 2187, n. 35, 38, p. 2493, n. 37.

From Clackamas: ROBERT G. MORROW, Judge.

In Banc.

MODIFIED.

For appellants there was a brief over the names of *Mr. E. B. Tongue, Mr. Grant B. Dimick* and *Messrs. C. D., D. C. & Earl C. Latourette,* with an oral argument by *Mr. Earle C. Latourette.*

For respondent there was a brief over the names of *Messrs. Dey, Hampson & Nelson* and *Mr. George L. Buland,* with an oral argument by *Mr. Ben C. Dey.*

BROWN, J.—This action is prosecuted to recover damages for the publication of an alleged libel concerning the plaintiff, a physician and surgeon, by the seven defendants, also physicians and surgeons.

Alexander DeFord was shot through the body and died thirty-one hours later at a hospital in Oregon City, where he was attended by Dr. O. A. Welsh, county physician, one of the defendants herein. Following the death of DeFord, his body was removed to Sellwood, Multnomah County, by his relatives, who employed the plaintiff, Dr. Mount, to make a post-mortem examination of the body for the purpose of ascertaining the cause of death. Thereafter, the body was removed to Oregon City, Clackamas County, and the coroner of that county impaneled a jury and proceeded to hold an inquest. Dr. Welsh testified as a witness before the coroner's jury, ascribing the cause of DeFord's death as "confluent pneumonia" following gunshot wound. The plaintiff was called as a witness and testified that death was caused immediately by septic peritonitis, resulting from the gunshot wound. The coroner went to Dr. Mount's office and procured from his bookkeeper a statement of his bill for making the post-mortem examination. That official approved the claim and thereafter transmitted it to the County Court of Clackamas County, where it was allowed.

The conflict in the testimony of the two physicians and surgeons before the coroner's jury seems to have stung Dr. Welsh to the quick. Welsh testified that, after the inquest an undertaker whispered into his ear that the plaintiff was about to graft the taxpayers of Clackamas County out of a fee for services performed for others, and that the undertaker proceeded to point out to Dr. Welsh his duty in the premises as it related

to the taxpayers, and particularly to the medical profession. According to the story told by Dr. Welsh, in an effort to save the good name of the medical profession and the funds of the taxpayers, he penned to the County Court the following protest against the allowance of Dr. Mount's claim:

"Oregon City, Oregon, December 2, 1920.
"To the Honorable County Court of Clackamas County, Oregon:

"We, the undersigned taxpayers of your county, and licensed physicians and surgeons of Oregon City, Oregon, do hereby protest against the paying of an autopsy fee to Dr. H. S. Mount for an autopsy on Alexander DeFord, for the following reasons:

"Presumably as stated by him the autopsy was performed at the instance of his relatives and information was confidential.

"Upon request by the coroner for his testimony, he insisted upon all information being confidential until promised by the coroner that he would O. K. his autopsy fee into the county court. Then he willingly testified that the death of DeFord was due to septic peritonitis.

"Furthermore, he either through gross misrepresentation or gross ignorance stated the man died from septic peritonitis (blood poisoning), when his temperature was normal, never going above 99 degrees Fahr., and then only the first two times taken after admission to the hospital. No person ever succumbs to a septic condition as soon as 31 hours after the infection, and then only after a more or less prolonged abnormal rise in temperature or fever.

"We do not believe that the county's money should be paid for such misleading testimony, or that it should be spent paying the services already contracted or paid for by other parties.

"In other words, we do not believe such attempted graft and profiteering should be countenanced, as it

reflects upon the medical profession when allowed to continue unchecked.''

"O. A. WELSH.
"M. C. STRICKLAND.
"A. H. HUYCKE.
"W. ROSS EATON.
"C. H. MEISSNER.
"C. A. STUART.
"GEO. E. STUART, M. D.''

After the preparation of the above writing by Dr. Welsh, he carried it to the several offices of the various physicians and surgeons whose names are appended thereto. He made to each of them an exposition of his diagnosis of the DeFord case, explained to each the nature of Dr. Mount's testimony before the coroner's jury, and to some of them at least he repeated the undertaker's admonition concerning the collection of the Mount bill from the county. Following his representations, Dr. Welsh secured the signatures of his six codefendants to the alleged libel. He then published the contents of the writing by placing it of record in the County Court. Thereafter, the plaintiff sued the seven physicians for damages. The defendants, answering, as a first defense pleaded the truth of the statements and charges contained in the alleged libelous writing. For a second defense, they averred that the matter contained in the writing was published upon a privileged occasion, to the County Court, and in good faith, and without malice.

The trial resulted in a verdict for the plaintiff. The defendants, appealing, made many assignments of error, which are grouped in their brief under twenty-five headings.

We will first take up the contention that Juror Adam Beil was disqualified because of the relationship of physician and patient, and because of his

views on the merits of the controversy.  Touching his qualifications, Beil testified on his *voir dire* that he had an opinion concerning the case that it would require evidence to remove; that he had formed his opinion from what the neighbors had said, and that he retained that opinion at the time of his examination.  Counsel for defendants put the following question to the juror:

"Q. Do you think, Mr. Beil, that you could lay aside that opinion, dismiss it from your mind entirely, and go into the jury-box and decide this case justly and fairly upon the evidence produced here to-day, and the law as given you by the court?

"A. Yes, sir.

"Q. And you would do that if accepted?

"A. Yes, sir."

Beil further testified that he had been acquainted with Dr. Mount for nearly two years; that Dr. Mount had been his family physician during that time and would be his physician now in case of illness in his family.

"Q. You feel very friendly toward Dr. Mount?

"A. Well, not any more than to any other doctor. He is family physician, you know, and I * * take stock in him."

When the court sought to obtain from the witness an expression in relation to approaching the case without a previous opinion, he testified:

"Well, I think I could.  I could decide the case on the evidence and the instructions of the court.  It would not bother me what I did.

"The Court: But would your opinion bother you in deciding the case? * *

"A. I don't think so."

1, 2. The determination of a juror's competency is primarily a question for the trial court.  An opinion

formed or expressed by a juror upon the merits of the cause from what he may have heard from his neighbors, together with newspaper reports, is not, of itself, sufficient to sustain a challenge: *State* v. *Armstrong,* 43 Or. 207, 216 (73 Pac. 1022); *State* v. *Megorden,* 49 Or. 259, 266 (88 Pac. 306, 14 Ann. Cas. 130); *State* v. *Brumfield,* 104 Or. 506 (209 Pac. 120).

"The court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." Or. L., § 123.

3. Again: The test of a juror's disqualification is the probability of interest, prejudice or bias, as determined by the court's application of his judicial knowledge to the facts of the particular case: *Rowe* v. *State,* 15 Ga. App. 660 (84 S. E. 132).

4, 5. That a jury shall be composed of competent persons, and that a competent juror means one who is impartial and stands indifferent both as to the parties and the cause to be tried, is an elementary principle in trial by jury: 35 C. J., § 348 (Juries); 16 R. C. L., p. 261. The fact that the statute provides certain grounds for challenge does not preclude a challenge and the exclusion of a juror on other grounds: Thompson & Merriam on Juries, p. 176; 16 R. C. L., p. 276; 35 C. J., § 427 (Juries). This is a rule of general application.

6, 7. The relationship of physician and patient is not set down by Section 122, Or. L., as forming grounds for challenge for implied bias; nor will actual bias be implied from the mere relationship of physician and patient. But, in the case at bar, we have an intelligent, strong-minded juror, with an opinion that the plaintiff should prevail. That opinion, coupled with the fact that the plaintiff is the juror's family physician, and with the further fact that the

case involves the learning and skill of his physician, should, as a general rule, disqualify the juror. However, in view of the record, the court's denial of the defendants' challenge can avail them nothing. The rule in this jurisdiction is announced by an opinion of Mr. Justice BURNETT in *State* v. *Humphrey,* 63 Or. 540 (128 Pac. 824), where he clearly states that, until a defendant's peremptory challenges are exhausted, he is not in a position to complain of the overruling of his challenge for cause to any particular juror who afterwards serves on the panel. We are aware of numerous authorities to the effect that, if the trial court has erred in overruling a challenge for cause, the defendant is not bound to cure the court's error by using a peremptory challenge. Nevertheless, as shown by the opinion of the learned justice:

"The larger number of authorities hold that, until a defendant's peremptory challenges are exhausted, he is not in a position to complain of the action of the court in overruling his challenge for cause to any particular juror who afterwards served on the panel. These later cases seem to teach that the law has provided not only challenges for cause, but also those peremptory to enable the defendant to protect his right to a fair and impartial jury; that, unless he avails himself of all those privileges whenever the occasion arises, he is in a sense leading the court into error which he might have cured if he had been so disposed and not having obviated the error when he could he is in no position to complain."

Then follow numerous citations. To the same effect, see 12 Ency. Pl. & Pr., p. 508.

8. The defendants next discuss the alleged misconduct of jurors Sharnke, Anthony and Michels. On the morning following the rendition of the verdict, R. D. Wilson, who was serving upon the regular panel of

jurors, but not on the Mount case, met Juror Sharnke. When they met, Wilson remarked to Sharnke:

"It was quite a verdict you brought in for Doctor Mount."

to which observation Sharnke replied:

"Damn that Welsh. He ought to pay, the way he used a friend of mine out there at Sandy on a donation land claim deal. I never had any use for him."

. Dr. A. Williams, a practicing physician of Sandy, Clackamas County, made an affidavit to the effect that, on June 20, 1922, the Juror Sharnke and others were engaged in conversation wherein they were discussing a controversy between Dr. O. A. Welsh, one of the defendants, and Dr. Hempstead, growing out of their respective rights to act as health officer of Clackamas County, Oregon, and that, during the discussion, Sharnke said:

"If you want to know what we think of Dr. Welsh, circulate a petition for Hempstead."

Dr. Williams further stated in his affidavit that Sharnke also said:

"George Krebs is a friend of mine, and I do not like Welsh a bit because he tried to beat Krebs out of government land, and the Government ain't through with him yet";

that one Hoffman replied:

"If Krebs had been as mean to Welsh as Welsh has been to him, Krebs would be behind the bars";

and that Sharnke then remarked:

"That is right. Welsh is a crook."

Affiant further stated that Sharnke then said:

"I am not through with the jury yet, and I must be a little careful what I say."

Percy T. Shelley, of Sandy, made an affidavit fully corroborating that of Dr. Williams.

One H. A. Heater, a real estate dealer of Oregon City, testified that Charles Sharnke conversed with him relative to the plaintiff, Dr. H. S. Mount, and Dr. O. A. Welsh, one of the defendants, and that, among other things, Sharnke said he did not like Welsh on account of the way he treated a neighbor over a land deal; that ''Dr. Mount had a majority of the business in Oregon City and that there were too many other doctors in Oregon City and that he was in favor of tearing them to pieces and scattering them right and left.''

Viola Scheer, a resident of Clackamas County, made an affidavit in which she said that she was personally acquainted with Mrs. Clara Anthony, a juror in the instant case. Affiant further stated:

''I met Mrs. Clara Anthony, a juror, and asked her as follows: 'How is the case?' And Mrs. Clara Anthony stated: 'I hope our side will win.' Then I asked her: 'Who do you think will win?' And she said: 'Mum's the word.' ''

J. B. Burgoyne, an affiant, says that he conversed with Clara Anthony about the case in his home at New Era during the trial, but that she failed to inform him that she had been instructed not to talk about the case.

Jacob Michels, a juror, who had been one of Dr. Mount's patients, says, in effect, that he consented to the rendition of the verdict in favor of the plaintiff in order to get through with the case.

Cora Foumal, a resident of Oregon City, made an affidavit in which she stated that the Juror Michels represented that he voted in favor of a verdict for the plaintiff because, unless the plaintiff should pre-

vail, he would lose his license to practice medicine in the State of Oregon.

The affidavit of H. A. Shandy represents that the Juror Michels said:

"That when the jury retired in the said case for rendition of a verdict, he was in favor of assessing damages against the defendant doctors in the sum of $250 each, but that he was given to understand by a member of the jury that if Dr. Mount did not get a heavy verdict he would lose his license to practice medicine, * * and for that reason he voted to assess the damages in the sum of $20,000."

Juror Charles Sharnke made a counter-affidavit in which the material matter contained in the affidavits of Dr. A. Williams, Percy T. Shelley, R. D. Wilson and N. A. Heater is denied. He says that, about a month after the rendition of the verdict in the cause, Dr. Williams came to him in the presence of the parties named and opened the conversation by saying that he (Williams) "wanted to know if he would sign a petition to have Dr. O. A. Welsh removed as health officer of the county because he was no good and ought to be put out." In other words, his affidavit tends to show that Dr. Williams attempted to entrap him into saying something derogatory to Dr. Welsh.

Clara E. Anthony made an affidavit in which she denies that she made the statement attributed to her, "I hope our side will win," also that she ever said, "Mum's the word." She further denies the statement of J. B. Burgoyne to the effect that she discussed the case with him.

Jacob Michels likewise made a counter-affidavit, in which he stated that he heard the remark set forth in his affidavit hereinbefore referred to, to the effect that, unless Dr. Mount should win his case his license

as a physician and surgeon would be taken away from him, but that "I was not influenced by said statement in any degree at all." He asserts that his verdict was based upon the testimony and the instructions of the court.

The counter-affidavits contained competent evidence of rebuttal of the matter set forth in the affidavits supporting defendants' motion for a new trial, and should have been considered by the court. See the recent case of *State* v. *Hecker,* 109 Or. 520 (221 Pac. 808).

9. It has been held that, where the falsity of a juror's testimony on his preliminary examination as to material matters is shown by competent evidence, a new trial should be granted upon the motion of the defeated party: *Hinkel* v. *Oregon Chair Co.,* 80 Or. 404 (156 Pac. 438, 157 Pac. 789). However, it is settled law in this jurisdiction that the granting of a new trial on account of misconduct or disqualification of a juror is within the discretion of the trial court, and that its determination will not be reversed except for manifest abuse: *Tucker* v. *Salem Flouring Mills Co.,* 13 Or. 28 (7 Pac. 53); *State* v. *Magers,* 36 Or. 52 (58 Pac. 892); *State* v. *McDaniel,* 39 Or. 161 (65 Pac. 520); *State* v. *Smith,* 43 Or. 109 (71 Pac. 973). Neither will such conclusion be set aside when attacked on appeal except where there is clear and manifest abuse of discretion: *State* v. *Lauth,* 46 Or. 342 (80 Pac. 660, 114 Am. St. Rep. 873).

10. We pass over the objections to Jurors Clara Anthony and Jake Michels without further comment. As to the voluble juror, Charles Sharnke, it should be remembered that his loose remarks were uttered after the rendition of the verdict. After the close of the trial it seems that Sharnke undertook to justify

the verdict. 12 Ency. Pl. & Pr., p. 551. However, he practiced no deception in qualifying as a juror. He testified that he knew Dr. Welsh. G. B. Dimick, the attorney who interrogated the juror for the defendants, asked no questions as to bias that the prospective juror might entertain toward Dr. Welsh, but, after a few preliminary questions, evidently relying upon his own knowledge of the juror, passed him for cause.

After an examination of the record, we are satisfied that the disposition of this question is controlled by the decision of this court in *State* v. *Powers*, 10 Or. 145 (45 Am. Rep. 138). In that case the defendant had been convicted of murder in the highest degree. After the trial the prisoner's attorney, on discovering that one of the jurors had at one time been convicted of a crime involving moral turpitude, moved for a new trial, which was denied. He thereupon appealed to this court, where it was held that this fact was not ground for a new trial. In discussing that case, the court quoted from *Wassum* v. *Feeney*, 121 Mass. 94 (23 Am. Rep. 258), a case wherein a motion was filed to set aside the verdict because one of the jurors was but 19 years of age. The opinion in the Wassum case was written by GRAY, C. J., who, in considering the motion to set aside the verdict on that ground, said:

"When a party has had an opportunity of challenge, no disqualification of a juror entitles him to a new trial after verdict. This convenient and necessary rule has been applied by this court, * * even in a capital case, to a juror who was not of the county or vicinage, as required by the Constitution."

11. The liability of Clackamas County to plaintiff is involved in this case. A county is a mere auxiliary of a state government and partakes of the state's

immunity from liability. The state is never liable
except by its own consent, and so the county is exempt
from liability, except such as is imposed or authorized
either expressly or impliedly by statute: 7 Am. & Eng.
Ency. of Law (2 ed.), p. 941.

12–14. Defendants assert that the plaintiff was en-
titled to nothing more than his statutory fees as a
witness before the coroner's jury. A professional
witness, such as a physician and surgeon, like other
people, may be compelled to attend court in obedience
to a subpoena, and may be required to testify to what
he knows, for the same statutory fees as those paid
other witnesses. As to any fact within the knowledge
of a professional witness, he stands upon an equality
with every other witness. But it is well settled that
a physician and surgeon meets the requirements of a
subpoena when he appears in court and gives im-
promptu answers to such questions as may be put
to him. He cannot be required, as such physician and
surgeon, to examine into the case and use his skill
and knowledge so as to form an opinion: Rogers on
Expert Testimony (2 ed.), §§ 185–196; Lawson on
Expert and Opinion Evidence (2 ed.), pp. 300–319.
Moreover, a physician and surgeon who conducts
a post-mortem examination under the direction of
the coroner may be allowed reasonable compensation
therefor.

15. In the case of *Clay County* v. *Thornton*, 90 Ark.
372 (119 S. W. 246), the acting coroner secured the
services of three physicians who performed the work
required of them, and each made a claim in the sum
of $25 for professional services rendered in holding
a post-mortem examination at an inquest over the
body of a young woman who died at a hotel under
suspicious circumstances. It was contended in that

case that the acting coroner exceeded his powers in employing and directing more than one physician to make the autopsy and that, for that reason, the county was not liable. The Supreme Court, in rendering its opinion, quoted from the case of *St. Francis County* v. *Cummings,* 55 Ark. 419 (18 S. W. 461), where it was held:

"If necessary to ascertain the truth concerning the death of a person over whose body he is required to hold an inquest, a coroner is authorized to employ a physician to make an autopsy, and the county is liable for a reasonable compensation therefor."

The court then said:

"The reason for the rule is that an examination aided by medical skill is necessary to a proper administration of justice. It is better both for the person suspected of having committed the crime and for the people. A thorough examination would put an end to groundless suspicions, and make more certain that a guilty person should not be turned loose upon society."

Finally, in disposing of the case the court held that the services of the claimants were necessary to ascertain the circumstances of the young lady's death, and that the fees charged were reasonable.

The liability of a county to a physician employed by the coroner to make a post-mortem examination was determined by the case of *Pruden* v. *Grant County,* 12 Or. 308 (7 Pac. 308), where it was held that the County Court, in auditing an account for services where the amount of compensation is not fixed by law, is engaged in the transaction of county business, and that its acts are judicial. In that case a physician, in obedience to a subpoena issued by the coroner of Grant County, assisted at an inquest held over the body of a deceased person. The physician

claimed $125 for his services, which claim was returned by the coroner as a part of the expenses of the inquest. The County Court cut the claim to $48.20 and disallowed the remainder. On the review of the case this court upheld the action of the County Court in allowing the claim and fixing the amount thereof.

In the case at bar, the post-mortem examination was not made in response to a request by the coroner, nor by the County Court, but by the relatives of De-Ford. But, according to the testimony in the case, it seems that the coroner, in so far as he could, undertook to assume, upon behalf of the county, the implied contract made between the doctor and the relatives of the deceased. The testimony shows that the claim for post-mortem examination, approved by the coroner for payment, was made a part of that officer's return; that the County Court allowed the claim, and that a warrant for the sum of $25 in payment for such examination was issued in favor of Dr. Mount.

16. The law is well established that, like an individual, a county, through its proper officers, may ratify an unauthorized contract made in its behalf, provided the contract is one that the county could have made in the first instance. Moreover, such ratification will be equivalent to original authority. See *Cunningham* v. *Umatilla County,* 57 Or. 517 (112 Pac. 437, 37 L. R. A. (N. S.) 1051); *Steiner* v. *Polk County,* 40 Or. 124 (66 Pac. 707); *McKenna* v. *McHaley,* 67 Or. 443 (136 Pac. 340); 2 Dill. Mun. Corp. (5 ed.), § 797; 7 R. C. L., § 22 (Counties); *Leathem* v. *Jackson County,* 122 Ark. 114 (182 S. W. 570, Ann. Cas. 1917D, 438); *San Francisco First Nat. Bank* v. *Nye County,* 38 Nev. 123 (145 Pac. 932, Ann. Cas. 1917C, 1195).

The discussion of Mr. Justice McBride in *Cunning-ham* v. *Umatilla County, supra,* pertaining to the principal function of every county government, is most illuminating.

17. It is claimed that the court erred in denying defendants' motion to strike from plaintiff's amended complaint certain allegations setting forth by way of inducement the colloquial meaning of the words "profiteering" and "graft" in the vicinity where the libel was recorded and published. The motion was properly disallowed: *Lafky* v. *Albert,* 68 Or. 373 (137 Pac. 209).

18. Defendants also assert that the court erred in admitting testimony as to the colloquial meaning of the words "profiteering" and "graft" at the time and in the vicinity where they were uttered. Most dictionaries fail to define the term "profiteer" or "profiteering." Profiteering involves the acquisition of excessive profits: Funk & Wagnalls' New Standard Dictionary of the English Language.

The alleged defamatory article states:

"We do not believe such attempted graft and profiteering should be countenanced, as it reflects upon the medical profession when allowed to continue unchecked."

It thus plainly appears from the record itself that the term "profiteering" was used as a term of reproach and dishonor and "reflected upon the medical profession."

19. In common usage, the word "graft" is a term of varied meaning. See Webster's New International Dictionary. As used in the alleged libel, 28 C. J., 756, 757, concisely defines the term in language following:

"Graft. * * As applied to individuals, officials, corporations, etc., a word, although of comparatively recent origin, the use of which has been so general that its meaning has become fixed and well recognized. Colloquially and politically it involves wrong-doing and illegality; but not always so, depending on the terms of the language with which it is used. The term is commonly used to designate an advantage which one person by reason of his peculiar position or superior influence or trust acquires from another; * * receiving of personal gain, without rendering compensatory services, by persons holding positions of trust and confidence; a dishonest transaction in relation to public or official acts. In this sense the term implies sometimes actual theft, corruption, dishonesty, fraud, a steal or swindle, *and always want of integrity.*"

20. It was unnecessary for the court to take evidence as to the meaning of the term "graft" as used in the writing in question. However, the court did not commit reversible error because it permitted the witnesses to define the term. There is no contention relating to the accuracy of the definitions given by the witnesses to either word. In *Barton* v. *Holmes,* 16 Iowa, 252, the alleged libel was:

"Hi Peake stole my share of the corn out of the field, and I can prove it."

The witness stated, over objection:

"I understood him to charge the plaintiff with stealing his share of the corn."

This was held not to be reversible error. See, also, *Currie* v. *Stairs,* 25 N. B. 4.

21. Many assignments of error relate to the limitation placed by the court on the cross-examination of Dr. Welsh. Defendant Welsh was called to the witness-stand by the plaintiff for the purpose of estab-

lishing the publication of the alleged libel. The defendants' counsel attempted to go into the circumstances under which each of them signed the libel, and the court sustained an objection made thereto by counsel for plaintiff. Later in the trial, however, the other defendants testified to all the circumstances involving the presentation to them of the protest by Dr. Welsh, and their signing thereof. Obviously, the defendants suffered no injury resulting from the order of proof.

22. The defendants assign error of the trial court in sustaining plaintiff's objection to the cross-examination of his witness, Rhoda Dawson, a nurse, relating to her salary as such. This was a collateral matter and the objection was properly sustained.

23. Defendants seek to reverse the judgment of the court below because the court allowed R. B. Runyon to testify from his transcribed notes of plaintiff's evidence taken before the coroner's jury. This witness testified that he had made an accurate stenographic report of the plaintiff's testimony before the coroner's jury; that he had extended these notes correctly; that the notes had been lost or destroyed, but that he had in his possession his extension of the original notes. Having no independent recollection of the testimony given by Dr. Mount before the coroner's jury, the witness was permitted to read from his extension of the original notes, which extension he swore was correct. The absence of the original notes was accounted for, and the use of a copy by the witness was not erroneous: 1 Wigmore on Evidence (1 ed.), § 749, and cases cited.

24. Error is assigned because the trial court refused to allow Welsh, in his rebuttal to Rhoda Dawson's testimony, to show that "the hospital chart had been

tampered with." Dr. Welsh had previously testified concerning the chart, and the court did not abuse its discretion in sustaining the plaintiff's objection to his giving additional testimony concerning it. He had had his opportunity to testify in reference thereto.

25–27. Defendants say the court erred in permitting the plaintiff to amend his pleading. This was clearly within the discretion of the court: Or. L., § 102; *Farmers Bank* v. *Saling*, 33 Or. 394 (54 Pac. 190). The admission contained in the original pleading, being an extrajudicial admission against interest, was still available as evidence: *Johnson* v. *Sheridan Lbr. Co.*, 51 Or. 35 (93 Pac. 470). But the court properly instructed the jury that the only existing pleadings were the pleadings as finally amended: *Kincart* v. *Shambrook*, 64 Or. 27 (128 Pac. 1003).

28–30. Under assignment 129, the court thus instructed the jury:

"It then follows that, when the county judge and commissioners are in regular session, they have a right to consider matters that are presented to them, and if they deem it in the interest of public justice or for any reason in their judgment it is proper to pay a particular bill, even though it has not been ordered, they have a right to pay it out of county funds, even though it is not ordered in advance by them, if, in their judgment, it is a proper public expenditure."

This is an incorrect statement of the law. The power of the court to bind the county rests upon the statute. Whether a given claim is a proper charge against the county and is one which the County Court may lawfully approve is determined by law. The mere fact that the court may deem the payment of a claim to be "in the interest of public justice" is not authority for the payment of such claim from public

funds. Time and again a County Court has been declared to be a court of inferior jurisdiction, whose duties are defined by law, and their right to pay a claim rests, not upon "their judgment," but upon law: *Wren* v. *Fargo,* 2 Or. 19; *Kelly* v. *Multnomah County,* 18 Or. 356 (22 Pac. 1110); *Bank of Idaho* v. *Malheur County,* 30 Or. 420 (45 Pac. 781, 35 L. R. A. 141). Furthermore, the discretion given to County Courts in the allowance of claims payable from public funds is a legal, and not a personal, discretion: 11 Cyc. 595; 15 C. J. 653, 654.

In the instant case, the right to pay the plaintiff's claim grew out of the ratification of the implied contract to pay.

31. It is claimed that the court erred in instructing the jury upon abstract propositions of law. To illustrate, we quote the following instruction:

"I have already told you that. That has nothing to do with paying for a bill for services performed by Dr. Mount in getting ready to testify where the testimony required preparation. If I am walking along on the street and am called into court and I am asked about the law, and I know it, I have to testify. I can't claim special privilege because I happen to be a lawyer. But if they want me to get ready to testify, and look up a proposition, why that is a matter of private contract; or, if after I have testified, public authorities say: 'We have used your information for a public purpose, and in our judgment it is proper that information, used for a public purpose, should be paid for by public funds,' I have entire right to accept the money."

In the instant case, Dr. Mount was not employed by the county, and he performed no services for the county "in getting ready to testify."

The court made similar declarations again and again in the presence of the jury. For instance:

"But he can't oblige any witness to testify by making original investigations or studies. * *

"The coroner cannot oblige anybody to prepare or get ready or do any expert work for that $1.70. * *

"But that does not cover getting ready to testify. You can call a handwriting expert and submit a paper to him and say: 'Is that genuine?' and get his offhand opinion. But if you direct him to go ahead and make preparations, he could say: 'I don't have to do it for $1.70. I will tell you what I know, but I don't have to make preparations and don't have to make special study out of court.' That is the law as I understand it."

And once again we find:

"I have told you already that does not cover preparation to testify."

The size of the claim was not the question. However after hearing all of these abstract instructions relating to the preparation to testify, and the testimony concerning the reasonableness of Dr. Mount's charge for performing the autopsy, it was natural for the jury to conclude that the question in dispute related to the size of the bill, and not its lawfulness, and that Dr. Mount had made special preparation on behalf of the county for the purpose of testifying.

32. A cause will not, in all cases, be reversed for error growing out of abstract instructions. But, for the reason that abstract instructions tend to draw the minds of the jurors away from the real facts in issue, this court has many times held that abstract propositions of law, although correct in themselves, are misleading and mischievous: *Bowen* v. *Clarke*, 22 Or. 568 (30 Pac. 430, 29 Am. St. Rep. 625), and the many cases there cited. As far back as 10 Or. 261, 262, it was declared by WATSON, J., in *Inverarity* v. *Stowell*, that, when error is shown in-

jury is presumed, unless the contrary affirmatively appears from the record itself. Adhering to this doctrine, Mr. Justice MOORE, speaking for the court in *Durkee* v. *Carr*, 38 Or. 189 (63 Pac. 117), held:

"While error will not be presumed, nevertheless, when it is manifest, prejudice is presumed, unless the bill of exceptions affirmatively shows that no injury could have resulted therefrom: *Inverarity* v. *Stowell*, 10 Or. 261; *DuBois* v. *Perkins*, 21 Or. 189 (27 Pac. 1044); *Nickum* v. *Gaston*, 24 Or. 380 (33 Pac. 671, 35 Pac. 31); *Cleveland Oil Co.* v. *Norwich Ins. Society*, 34 Or. 228 (55 Pac. 435); *Carney* v. *Duniway*, 35 Or. 131 (57 Pac. 192, 58 Pac. 105)."

To the same effect are *Carter* v. *Wakeman*, 45 Or. 427 (78 Pac. 362); *State* v. *Osborne*, 54 Or. 289 (103 Pac. 62, 20 Ann. Cas. 627).

33, 34. The defendants reserved an exception to the refusal of the court to give the following requested instruction on mitigation of damages:

"I instruct you that, even in the event you should find the communication was not privileged, and in the event that you should find that the defendants have not proven the article to be true, yet if, on the other hand, you should find that they acted in good faith under an honest conviction of the truth of the article, and the article was published under such belief in its truth, then you should consider the good faith in determining the amount of damages and have a right to consider such good faith for the purpose of mitigating or lessening the damages."

Our Code provides:

"In the actions mentioned in the last section (libel or slander), the defendant may, in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances, to reduce the amount of damages; and whether he prove the justi-

fication or not, he may give in evidence the mitigating circumstances.'' Or. L., § 92.

The answer of defendants sets forth certain alleged facts which, if true, constitute mitigating circumstances. Testimony was adduced tending to support these allegations. The defendants testified to a number of circumstances tending to show that they filed the protest involved herein in good faith, believing the matters therein stated to be true, and that they never intended that that article should become a public record. The testimony of Coroner Johnson to the effect that, when he requested the plaintiff to become a witness before the coroner's jury he promised to see that the county paid the plaintiff his autopsy fee due from DeFord's relatives if he would consent to become such witness, is some evidence in support of the defendants' contention. The rumor of the coroner's guarantee spread. It reached the undertaker. He communicated it to defendant Welsh, and Welsh carried it to his codefendants.

To enable a trial jury to exercise with any degree of accuracy the sound discretion imposed upon it by law, it ought to have before it all material attending circumstances, and should receive from the court the law applicable thereto. In the cause at issue, the trial court gave elaborate instructions concerning compensatory and punitive damages, but failed to instruct the jury in the matter of mitigation of damages. There are degrees of malice that may lessen or enhance the guilt of a defendant. There are likewise degrees of malice that may lessen or enhance the damages that should be awarded. It is the purpose of the statute to give to a defendant who has erred, but who at the same time has acted honestly

and in good faith, the benefit of palliatory circumstances. This doctrine was announced in the early case of *Shartle* v. *Hutchinson*, 3 Or. 337, where Mr. Justice UPTON, in charging the trial jury, said:

"The defendant has a right, even when he declares the charge is true, to give evidence of circumstances in mitigation of damages. * *

"If you think from the evidence that the charge was not true, and yet that the defendant had reason to believe the charge to be true, and did so believe when he made the charge, and still so believes, the circumstances may go to the mitigation of damages, but are not a justification."

In the case of *Upton* v. *Hume*, 24 Or. 420, 436 (33 Pac. 810, 41 Am. St. Rep. 863, 21 L. R. A. 493), Mr. Justice BEAN, in delivering the opinion of the Court, wrote:

"It was formerly the law that, if the defendant in a libel suit pleaded the truth in justification, and failed to establish such plea, it was considered as evidence of malice, and in aggravation of the injury, and he was precluded from asking any mitigation of damages even if the plea was made in good faith and with an honest belief that it was true: *Bush* v. *Prosser*, 11 N. Y. 366. But section 91 (now 92) of the Code of this state * * has changed the rule, and under this section the damages are not necessarily affected by a failure to make good a plea of justification. It will depend upon the motive with which the plea was interposed, and the good faith of the defendant * * The result of the decisions of the state of New York, under a statute like ours, is that the mere inability to establish a justification is no evidence at all of malice, or in aggravation of damages, nor will it preclude the defense from asking that the damages be mitigated where it appears that he was free from malice, and had good reason to believe the libel that he published to be true."

The court erred in refusing to instruct the jury as requested.

35. To the end that justice be established, the people ordained our Constitution: Or. Const., Art. I, § 1. Our Bill of Rights guarantees that justice shall be administered completely and without delay: Art. I, § 10. For the purpose of fulfilling these wholesome principles, the people, in whom the sovereign power resides, adopted Article VII, Section 3-c, Oregon Constitution. The provisions of this amendment are peculiarly applicable to the admitted facts in this case. It reads:

"In actions at law, where the value in controversy shall exceed $20, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict. Until otherwise provided by law, upon appeal of any case to the Supreme Court, either party may have attached to the bill of exceptions the whole testimony, the instructions of the court to the jury, and any other matter material to the decision of the appeal. If the Supreme Court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial; or if, in any respect, the judgment appealed from should be changed, and the Supreme Court shall be of opinion that it can determine what judgment should have been entered in the court below, it shall direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the Supreme Court; provided, that nothing in this section shall be construed to authorize the Supreme Court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided

than that of which the accused was convicted in the lower court." Or. Const., Art. VII, § 3–c.

The meaning and intent of the above constitutional provision, as referring to the jurisdiction of the Supreme Court to retry a case on the record and enter a lawful and proper judgment, providing the case made on appeal discloses material error, has heretofore received full consideration of this court. See *Hoag* v. *Washington-Oregon Corp.*, 75 Or. 588, 612 (144 Pac. 574, 147 Pac. 756). Our power under the Constitution does not require a restatement. In the Hoag case the plaintiff had recovered a judgment for $30,000 for personal injuries. Error having been demonstrated upon the trial in this court, it became the duty of the appellate court either to retry the case on the record and enter judgment thereon or remand it to the lower court for retrial. This court retried the case and entered judgment against the appellant for $14,000. That case is authority for the proposition that, if the appellate court finds material error, it may retry the case on the record and enter a proper judgment thereon. In the case of *Knight* v. *Beyers,* 70 Or. 413, 418 (134 Pac. 787), the court held that the above constitutional provision was enacted to prevent a multiplicity of retrials in the Circuit Court, and that, upon appeal, error of the trial court should not constitute cause for reversal if this court, having before it the record and testimony, possessed sufficient information upon which to retry the cause and determine what judgment ought to be rendered upon the law and the facts. See, also, *Obenchain* v. *Ransome-Crummey Co.*, 69 Or. 547, 555 (138 Pac. 1078, 139 Pac. 920).

It is well settled that the right to correct a judgment under this constitutional provision is based upon

error of law committed by the trial court. In the case at bar, the evidence is reported in its entirety. It follows that this court is empowered to make final disposition of the case and to render the judgment which should have been rendered below: *State ex rel. Anderson* v. *Port of Tillamook,* 62 Or. 332, 344 (124 Pac. 637, Ann. Cas. 1914C, 483). By a retrial of the case here, added responsibilities and additional labor devolve upon us. But our duty in the instant case, under the Constitution as determined by this court, seems plain. The case has been pending in the courts a long time. The litigation involved should come to an end. With the complete record before us, we are as well prepared to solve the facts and apply the law thereto as is the trial jury.

Now, reverting to the doctrine heretofore announced by this court, the first inquiry is: Was any material error of law committed by the trial court? This question must be answered in the affirmative. The next: Having before it the complete record, including all the testimony, does this court possess sufficient information upon which to retry the cause and determine what judgment should be entered upon the law and the facts? Of this we are satisfied.

Does the record disclose a malicious publication by the defendants, imputing to the plaintiff something which has a tendency to injure his reputation, to disgrace or degrade him in society, lower him in the esteem and opinion of the world, or bring him into public hatred, contempt, or ridicule? Newell, Slander and Libel (4 ed.), p. 3. This question is best answered by a careful reading of the alleged libel hereinbefore set out, with an understanding of the situation.

36. The record clearly discloses that, on the date of the publication of the alleged defamation, the plaintiff, Dr. H. S. Mount, was a duly licensed and practicing physician of good repute, engaged in his profession at Oregon City, Oregon, and that he had a lucrative practice in that city and in the vicinity thereof. It is alleged and admitted that the defendants published of and concerning Dr. Mount an article in which he was charged with gross ignorance or with the giving of wilfully false testimony, and accused of "attempted graft and profiteering." The parties making this charge were seven of plaintiff's professional brethren, and their utterances carried weight. We have seen that the defendants claimed justification by alleging the truth of the contents of the article. They failed to prove the truth of the alleged defamatory matter. However, in mitigation of damages, we have considered all facts tending to prove the charge: *Upton* v. *Hume*, 24 Or. 420 (33 Pac. 810, 41 Am. St. Rep. 863, 21 L. R. A. 493).

37. Defendants say that their protest is entitled to the protection given by the law as a qualified privileged matter; that is, they claim that, as citizens and taxpayers, they have an interest in the subject matter of the protest, and that the County Court, to whom the communication was addressed, has a corresponding interest therein. The law is well settled that a person speaking honestly for the common good shall be protected. But, when a person acting under a sense of duty makes a communication which he reasonably believes to be true, he must be careful not to be led away by his honest indignation, into exaggerated, unwarrantable or malicious expressions. The privilege extends to nothing which is not justified by the occasion.

38. The circumstances surrounding the case at bar neither justified these physicians in charging the plaintiff with wilfully giving false testimony, nor with gross ignorance, nor with being a grafter, nor with profiteering. The record plainly discloses that the assertion that Dr. Mount is a "grafter" was a gross exaggeration, and that the application to him of that term was unwarranted. Under the testimony in this case, Dr. Mount, in making the post-mortem examination, charged the usual fee allowed for such professional work in Clackamas County. There is nothing in the record showing that those who employed him in the first instance to perform the autopsy were not financially responsible for the fee of $25. The plaintiff received no benefit because the county assumed the bill contracted by the relatives of DeFord. The amount of the claim was the same, whether paid by the relatives of DeFord or by the county. So far as the record discloses, the only persons who gained any advantage by the change of paymasters were the members of the DeFord family. Members of that family employed the doctor and requested the coroner to assume the bill upon behalf of the county. It was the coroner who procured the claim from plaintiff's office, approved it and filed it with the County Court. We have heretofore alluded to the ratification of the employment contract by the County Court.

In passing upon the claim of Dr. Mount for making the post-mortem examination of the body of De-Ford, it was the duty of the County Court to seek enlightenment. It was proper for the court to hear any protest from taxpayers for the purpose of learning the facts. It was the right of defendants to state all the facts and circumstances pertaining to the claim.

But, in going beyond the facts, and in vilifying and maligning the plaintiff under cover of their protest, they overreached the privilege afforded by the occasion.

39. That the defendants maliciously published defamatory matter of and concerning the plaintiff is established by the record in this case.

In view of the existing facts and circumstances shown by the record, we are of opinion that the sum of $5,000 would be a fair and just sum to award the plaintiff. Therefore, the judgment of the Circuit Court will be set aside and findings and judgment entered here in favor of plaintiff and against defendants, in the sum of $5,000, and for the costs and disbursements of this action.      MODIFIED.

BURNETT, J., dissents.

McBRIDE, C. J., not sitting.